(No. 23079.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. LOUIS W. GRUBER, Plaintiff in Error.

*Opinion filed December 16, 1935—Rehearing denied Feb. 5, 1936.*

HARRY P. GABEL, JOHN LEWSON, and CHARLES M. MC-DONNELL, (GEORGE W. HUNT, and THOMAS MARSHALL, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, HENRY E. SEYFARTH, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE FARTHING delivered the opinion of the court:

This writ of error was sued out by Louis W. Gruber to review the judgment of the Appellate Court for the First District. That court affirmed the judgment of the criminal court of Cook county where a jury had found defendant guilty on all fifteen counts of the indictment. In each of the respective counts he was charged with obtain-

ing a signature to a written instrument by false pretenses, contrary to section 96 of the Criminal Code. (38 S.H.A.S. 253; Ill. State Bar Stat. 1935, chap. 38, par. 228, p. 1178.) The section provides: "Whoever, with intent to cheat or defraud another, designedly by color of any false token or writing, or by any false pretense, obtains the signature of any person to any written instrument, or obtains from any person any money, personal property or other valuable thing, shall be fined * * * and imprisoned," etc.

On each of the first seven counts defendant was sentenced to pay a fine of $10 and to serve one year in the house of correction. These sentences ran concurrently. He received a similar sentence on each of the other eight counts. The sentences under the last seven counts ran concurrently with that on the eighth count, and all eight sentences were to begin at the end of the first year's imprisonment. The fines totaled $150 and the imprisonment two years.

In substance the first count charged that defendant, Gruber, also known as L. S. Schrader, pretended falsely to the Great Atlantic and Pacific Tea Company, (hereafter called the tea company,) its agents, representatives and employees, and to Philetus D. Hall, also called Phil D. Hall, that the Shellmar Products Company had a subsidiary named the Monarch Specialties Company; that it was the custom of the Shellmar Products Company to have its products invoiced and collections therefor made through this subsidiary; that defendant also pretended that the sale price for 99,260 cellophane doughnut wrappers bought by the tea company from the Shellmar Products Company, (hereafter called the products company,) was $8.92 per thousand, although, as defendant knew, the true price per thousand was then $5.98; that defendant knew that the invoice for the wrappers was not made by the Monarch Specialties Company as a subsidiary of the products company, and knew it was not the practice or custom of the

products company to have any of its merchandise invoiced by or collected for by this alleged subsidiary company, and knew that the invoice for wrappers was not so made but was made by him in the name of the Monarch Specialties Company; that he knew that these representations were false, and they were made by him with the design of inducing the tea company, its employees, and its authorized agent, Hall, to execute a check for $1149.72, and to induce the tea company, its employees, and Hall, its authorized agent, to deliver the check to defendant after it was signed; that the tea company and Hall, relying upon these false pretenses, signed and delivered the check to defendant, and defendant, with intent to cheat and defraud the tea company out of $303.69, fraudulently and unlawfully obtained the signature of Hall to the written instrument. The fifteen counts are alike, except as to dates, purchases and amounts involved.

In August, 1933, defendant resigned his employment with the tea company at its division office in Chicago. He had been promoted from time to time after beginning as a clerk in 1925 and by 1929 had become an assistant purchasing agent.

The products company sold cellophane wrappers. Its salesman, Huse, called on the tea company and through defendant secured an order for one million wrappers on October 9, 1929. At first defendant directed that the wrappers be delivered to the tea company, in whose name the order was given, but before any deliveries were made he told Huse to bill the Monarch Specialties Company at 1145 Bryn Mawr but to make delivery to the tea company. At that time defendant told Huse that the Monarch Specialties Company was a packaging department of the tea company. He later gave 668 Oakdale avenue, Chicago, as the new address of the Monarch Specialties Company. The order for wrappers was not signed by the tea company or by defendant for it, and no copy of it was found in the tea

company's files. It was agreed by defendant and Huse that the price of $8.92 per thousand contained in the order was to be reduced if the market price of cellophane fell. Accordingly, on numerous occasions shipments were delivered to the tea company and a lower price was made in the invoices sent to the Monarch Company. Huse renewed the one million wrapper order from time to time, when shipments had exhausted the merchandise it covered. A discount of two per cent was allowed for payment of bills within ten days. Although Gruber, through the Monarch Company, took advantage of this discount and the decreases in price occasioned by changes in the cellophane market, he charged the tea company the original price per thousand for the wrappers and collected from the tea company for all deliveries. It was stipulated that the Monarch Company paid the products company in full on all invoices. The testimony shows that defendant, under the name of L. S. Schrader, rented an office at 1145 Bryn Mawr for the Monarch Company and received mail addressed to it; that later, by defendant's direction, such mail was forwarded by a nurse employed by a doctor at 1145 Bryn Mawr in care of another doctor's office at 668 Oakdale avenue.

Defendant introduced himself at the Lake View Trust and Savings Bank as L. S. Schrader and opened an account in the name of the Monarch Specialties Company on September 27, 1930. He closed this account on October 16, 1930, re-opened it on October 17, 1930, and then again closed it September 21, 1933. The signature card furnished the bank in connection with the Monarch Specialties Company's account bore the name "L. S. Schrader," and the addresses 1145 Bryn Mawr and 668 Oakdale. Defendant notified an officer of the bank when he was about to draw checks for any considerable amounts of money.

At the trial defendant stipulated that the fifteen checks that Hall identified were deposited in the Lake View Trust

and Savings bank by the Monarch Specialties Company, and that it drew checks and paid from its account in that bank the products company for the fifteen sales of merchandise in question.

The tea company's invoices, orders, receipts and all purchase records were handled by the purchasing, financial auditing and the financial departments. Martha Janney, Eunice Berkland and Moneta Kidney were employed for several years as order writers and stenographers in the purchasing department. In buying, the purchasing agent would give the data to one of these girls, who would write up the order on a special blank and make five copies. The original was white and went to the vendor. The next copy was blue and went to the financial auditing department. The third copy was yellow and was for the files of the purchasing department. The fourth copy was pink and was for the files of the purchasing agent. The fifth copy went to the tea company's New York office. When completed these five copies were given to the buyer, so that he might sign the original order. The stenographer who made up the order would type her initials on it. These three stenographers were shown exhibits which purported to be purchase orders from the tea company to the Monarch Specialties Company and which bore defendant's initials, "L. W. G.," and their respective initials. Each denied having written the orders which bore her initials and gave reasons for the denial. Each of them, and Archie Gates, an assistant buyer, made a search of the tea company's files and found no copies of orders issued to the Monarch Specialties Company by the tea company. E. H. Holmes, who was formerly head of the divisional purchasing department at Chicago, testified that he did not recall and never saw an order from the tea company to the Monarch Company.

Elizabeth A. Lauer was employed in the financial auditing department. She took care of shipments to other units of the tea company, matched orders with the invoices and

prepared bills for payment. The orders, invoices and receiving records were checked as to kind and amount, and after being re-checked they were sent to the financial department, for payment. Mrs. Lauer testified that she found that the receiving record showed the wrappers were delivered by the products company but that the invoice was from the Monarch Specialties Company. Over objection of defendant she testified that in 1929 or 1930 she talked about this with defendant, and that he told her that the Monarch Specialties Company was the Chicago representative of the products company, whereupon she approved the papers and passed them along for re-checking and payment. She made no further inquiries thereafter, but it was shown that all the invoices from the Monarch Specialties Company were thereafter checked and passed in the same manner for payment.

Myron F. Luhrsen testified that he was employed in the financial auditing department of the tea company from 1929. He said that when the order, invoice and receiving record matched, as evidenced by Mrs. Lauer's O. K., he would examine these papers, and, finding them correct, would pass them on for final approval and payment. He said that he took an invoice from the Monarch Specialties Company dated May 3, 1930, with the receiving record, which bore the name "Shellmar Products Company" to defendant and asked him what connection the products company had with the Monarch Specialties Company. Defendant told him the Monarch Specialties Company was the Chicago representative of the products company and that therefore it would be O. K. to pay it. Later, Luhrsen marked this exhibit as follows: "Chicago representative of Shellmar Products, per Mr. Gruber." He made no further inquiry with reference to the two companies and thereafter approved similar bills for payment.

Leo Hanley testified that he was censor clerk for the tea company during 1932 and 1933. He gave final ap-

proval to invoices for payment after they had been satisfactorily checked by Mrs. Lauer and Luhrsen. After he had placed his signature on the file it was sent to the financial department for the issuance of a check.

Philetus D. Hall testified that he was employed in the financial department of the tea company and that he signed the checks covering the amounts named in the invoices of the Monarch Specialties Company. These checks were fully made out when they came to him and were accompanied by the invoices, orders and receiving records. He signed the checks, took the file of documents apart, put the checks aside for mailing and then had the vouchers and invoices filed. He testified that when the invoice accompanying the check bore certain signatures the check was O. K. for payment. It was stipulated that the fifteen checks signed by this witness paid the various Monarch Specialties Company invoices offered in evidence.

Two character witnesses testified for defendant. No attempt was made to contradict the evidence offered by the People.

Defendant contends that it was error to overrule his motion to quash the indictment; that incompetent and immaterial evidence was admitted at the trial; that the tea company did not rely upon the false pretenses; that the evidence does not prove him guilty beyond a reasonable doubt; that the trial court erred in giving and refusing to give instructions to the jury, and that the judgment entered was ambiguous, uncertain and incomplete.

No point is made with reference to the overruling of defendant's written motion to quash. Defendant also made an oral motion to quash and stated the specific grounds for it. They do not include indefiniteness and uncertainty, and this point is therefore not before us. *People* v. *Fox*, 346 Ill. 374.

Defendant contends that the indictment should have been quashed because it did not allege an offense which

comes within the meaning of the statute. He says that the facts disclose a business arrangement with which all the parties were satisfied; that the legislature did not intend the statute to cover obtaining a signature to a check for a larger amount than was actually due from the tea company, whose authorized agent signed the checks in question, and that, in substance, the intent of the legislature was to limit prosecutions to cases where the fraud was in the execution—that is, where a signature is obtained to one kind of instrument which had been falsely represented to be a different kind of writing, and not to include a business arrangement of this kind. In answer to this contention that part of the section in question set out above contains no indication of any such restricted meaning, and our holding in *People* v. *Cohn,* 358 Ill. 326, 333, and cases there cited, is, that any false representation of an existing fact or condition by which the property of another is obtained is a false pretense under the law defining that crime. In the *Cohn case* the defendant falsely represented that he had the ability to secure civil service positions and that he would do so for a money consideration. While it is not charged in this indictment that the property of the tea company was obtained, the principle applies with the same force to the charge that a signature was wrongfully obtained to an instrument. In further answer to this contention, it is not shown by this record that any arrangement for merchandise was ever made between the tea company and the Monarch Specialties Company, which is clearly shown to have been only a name under which defendant operated in his scheme to defraud his employer. His argument that this is a business arrangement which was entirely satisfactory to everyone concerned has no testimony or facts to support it.

No error was committed when the trial court overruled defendant's oral motion to quash the indictment, and the Appellate Court was correct in so holding.

Defendant contends that Mrs. Lauer's testimony as to her conversation with him in which he stated that the Monarch Specialties Company was the Chicago representative of the products company was improperly admitted in evidence. He made no such objection when Luhrsen testified to a similar conversation, but his objection made in connection with Luhrsen's testimony was to the admission of People's exhibit 22 and the memorandum Luhrsen noted thereon.

The objection that the conversation with Mrs. Lauer was more than eighteen months before the date on which Philetus D. Hall signed the first check mentioned in the indictment, and that therefore the pretense, although false, was made beyond the period of limitation and had to do with a separate and distinct offense which could not be prosecuted because barred, was properly overruled. The statement of defendant tended to show his fraudulent intent, and was therefore competent. *People* v. *Simos,* 345 Ill. 226, 235.

The admission of People's exhibit 22 with the notation made by Luhrsen, out of defendant's presence, was not prejudicial error. The memorandum merely stated that the Monarch Specialties Company, according to Gruber, was the Chicago representative of the products company, and the exhibit itself was the same sort of an invoice from the Monarch Specialties Company as the fifteen others which were the basis for the fifteen checks which Philetus D. Hall was induced to sign for the tea company. The memorandum merely contains the substance of Luhrsen's testimony. In *People* v. *Oberholdt,* 359 Ill. 39, 40, 41, we held that the admission of incompetent testimony will not constitute prejudicial error if it appears that such testimony could not reasonably have affected the result. Defendant was not prejudiced by the admission of this exhibit in evidence.

Defendant's third point is that he was not proved guilty beyond a reasonable doubt. He contends that where an in-

dependent investigation was made by the tea company it relieved him of any culpability for false pretenses. The record shows that no such investigation was made.

It is also urged that the false representations were not such as would deceive and were not calculated to accomplish the purpose charged, because some of them were too remote in time from the obtaining of the signatures to the checks. It must, however, be remembered that here the false pretenses, in the main, consisted of invoices made and acts done by defendant. As to the oral false pretenses that the Monarch Specialties Company was the Chicago representative of the products company, what we said in *People* v. *Jarvis,* 306 Ill. 611, furnishes a complete answer to the contention that these false pretenses were too remote. The effect of that holding was that the real point is not the remoteness in time of making, but the causal connection between such representations and the obtaining of the property by means of them. Defendant here continued to make false pretenses by means of invoices which he sent to the tea company. He induced its employees to audit and approve these bills and Hall to sign the checks. It was immaterial that Gruber had no conversation with Hall. Such conversations formed no part of the regular course of business in the signing of the tea company's checks. Nor is it material that the tea company owed a part of the money covered by the checks to the products company. Defendant's guilt was established beyond a reasonable doubt.

It is contended that the tea company could have learned the true facts by investigation and that its negligence excuses defendant. The contrary rule is laid down in *Keyes* v. *People,* 197 Ill. 638, and *Thomas* v. *People,* 113 id. 531.

No specific objections were made to the instructions which were given by the trial court. At the time this case was tried defendant was required to comply with section 67 of the Civil Practice act and to make specific objections to given instructions. *People* v. *Schneider,* 360 Ill. 43.

Defendant requested the court to give refused instructions or suggestions numbered 2 and 3. These suggestions were covered by the given instructions. In addition, the third suggestion was misleading. There was no error in refusing to give these suggested instructions.

There is nothing indefinite in the judgment rendered by the trial court. Under it defendant was sentenced to pay a fine of ten dollars and to serve one year in the house of correction on each count. The sentences under the first seven counts ran concurrently. The same is true of the sentences on the last eight counts. These latter sentences were to commence at the expiration of those on the first seven counts.

For the reasons indicated the judgments of the Appellate Court for the First District and of the criminal court of Cook county are affirmed. *Judgments affirmed.*