Betty **FINNEY** and **Edward F. Finney,** Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15600.**

United States Court of Appeals
Ninth Circuit.

March 19, 1958.

---

Paul P. Selvin, Irving Rogosin, Los Angeles, Cal., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Myron C. Baum, Lee A. Jackson, Robert N. Anderson, Fred E. Youngman, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before CHAMBERS and BARNES, Circuit Judges, and JERTBERG, District Judge.

JERTBERG, District Judge.

Petitioners are husband and wife, who, under the community property law provisions, filed separate tax returns for the year 1945. The two cases were consolidated in the Tax Court and petitioners filed herein a joint petition for review.

The Tax Court held petitioners liable for deficiencies in these returns which deficiencies rested on three separate items in petitioners' 1945 returns.

These three items may be stated as follows:

1. Did petitioners suffer a loss of $5,300 in 1945 in connection with the film entitled "Strange Holiday"?

2. Did petitioners suffer a loss of $5,000 in 1945 in connection with the film entitled "White Fury"?

3. Was $10,824 received in 1945 from the film "Sensations of 1945" ordinary income or a long term capital gain?

The first two questions will be considered together. The petitioner, Edward F. Finney, was engaged in various phases of the motion picture industry, including the production, direction, purchase and sales of motion pictures. In 1943 he purchased the film, "Strange Holiday", for $4,000. Petitioner thereafter expended $6,300 for actors, labora-

tory work, re-editing and kindred production expenses. In their separate income tax returns for the year 1945 the petitioners claimed a loss of $5,300 on this motion picture. This film depicted a fictional invasion and occupation of the United States by Nazi Germany, and starred Claude Rains. The picture had been made during the middle of World War II. The expenditures made by Finney after the purchase were designed to make the film qualify for general presentation in theaters. In May of 1945 Nazi Germany surrendered. As gleaned from the transcript, the petitioners' contention appears to be that because of the nature and theme of the picture, it became worthless upon the cessation of hostilities between this country and Germany in the Spring of 1945.

The bulk of the expenditures made by petitioners to re-adapt the film were made in 1944. Some expenditures, however, were made as late as August of 1945. After 1945, the film was stored without storage charges, and no loan was sought or insurance carried on the film. Finney was unsuccessful in his efforts during the remainder of the year 1945 to get the film exhibited commercially. After 1945 Finney made some efforts to dispose of the film or to get it exhibited commercially, but these efforts were not aggressive or concerted. Finney finally disposed of the film in 1951 for approximately $2,100.

In 1943 the petitioner, Edward F. Finney, and A. W. Hackel purchased for $3,000 distribution rights, copyrights and various other rights to the film "White Fury", a motion picture produced in Sweden and purportedly owned by a Swedish corporation known as "Irefilm". A payment of $500 was made in 1943 and a payment of $2,500 was made on September 21, 1945. In addition to the purchase price of $3,000, petitioners incurred expenses in the amount of $7,000 in re-adapting this film for American distribution. In their separate income tax returns for 1945 petitioners claimed a loss of $5,300 on this motion picture. This film was completed in 1945 and was shown for the first time in September or October of 1945. After the first showing, the representative of a Swedish business organization advised Finney that Irefilm had been adjudicated a bankrupt in 1939 and that the organization owned the rights to the film, and that the person who sold the film to Finney had no authority or right to sell it.

Finney tried to sell the English rights to the film in England, but because of the claim of the Swedish owner, the agreement was not reached. In the meantime, Finney sent the negative to England in an effort to sell the English rights in it. In 1946 an injunction was secured in an English court and the negative was seized. Finney contends that by the end of 1945 he realized he had made a foolish investment and petitioners deducted the losses in their 1945 returns. Finney did not concede the absence of any rights to the film until its seizure in 1946.

The amounts of the losses claimed on these two pictures are not in dispute. The Commissioner disallowed such deductions in connection with both films on the ground that the worthlessness of these films in 1945 had not been established.

The petitioners contend that as a matter of law the evidence before the Tax Court fails to sustain the findings of the Tax Court that worthlessness of these films was not established in 1945, and that the claimed losses under Section 23(e) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 23(e) were clearly shown. The 1939 Internal Revenue Code, Section 23(e), provides among other things, that in computing net income there shall be allowed as deductions in the case of an individual "losses sustained during the taxable year and not compensated for by insurance or otherwise" if incurred in the trade or business, or if incurred in any transaction entered into for profit, though not connected with the trade or business.

Losses are deductible under this section only for the year in which they are sustained and the burden of

proof that a loss occurred in the year in which the deduction is claimed is upon the taxpayer. Boehm v. Commissioner, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78; Jones v. Commissioner, 9 Cir., 103 F.2d 681.

■ ■ Petitioners recognize that whether and when a deductible loss results is a factual question to be decided according to the surrounding circumstances. Alison v. U. S., 344 U.S. 167, 73 S.Ct. 191, 97 L.Ed. 186. We have reviewed the transcript with respect to the losses in 1945 relating to these two films. The evidence before the Tax Court consists almost entirely of the uncorroborated testimony of the taxpayer himself. In many particulars his testimony was vague and uncertain, and in some instances, confusing and contradictory. The weight to be given to his testimony, in the light of its nature and character, and the manner and demeanor of Finney while testifying, was within the discretion of the Tax Court. Conflicting inferences might reasonably be deduced from many portions of the transcript. We are unable to say that the evidence fails to support the findings of fact of the Tax Court, even though the Tax Court might reasonably have arrived at a different conclusion.

As stated in Boehm v. Commissioner, supra, 326 U.S. at page 293, 66 S.Ct. at page 124:

"But the question of whether particular corporate stock did or did not become worthless during a given taxable year is purely a question of fact to be determined in the first instance by the Tax Court, the basic fact-finding and inference-making body. The circumstances that the facts in a particular case may be stipulated or undisputed does not make this issue any less factual in nature. The Tax Court is entitled to draw whatever inferences and conclusions it deems reasonable from such facts. And an appellate court is limited, under familiar doctrines, to a consideration of whether the decision of the Tax Court is 'in ac-cordance with law'. 26 U.S.C. 1141 (c) (1), 26 U.S.C.A. § 1141(c) (1). If it is in accordance, it is immaterial that different inferences and conclusions might fairly be drawn from the undisputed facts."

The decision of the Tax Court must be sustained with respect to the claimed losses on these two films.

■ The third item to be considered relates to the receipt by petitioners in 1945 of the sum of $10,824 from the film "Sensations of 1945". Petitioners contend that such income represents long term capital gain. The Tax Court held that such income must be treated as ordinary income.

For a proper understanding of the problem presented, it is necessary to outline the events and background material which gave rise to the receipt by petitioners of said sum.

The record is not as clear as it might have been had petitioners been represented by counsel before the Tax Court. Notwithstanding the lack of familiarity of Mr. Finney with court procedure and his inexperience in presenting his contentions in an orderly and coordinated manner, a fair review of the record discloses the following facts:

In 1941 or 1942 Finney became associated with one Andrew Stone, who was established and experienced in the production of motion pictures. Apparently Stone had an agreement with United Artists Picture Corporation for the distribution of motion pictures produced by him. Discussions were had between the two and one Edward Jackson, looking toward the formation of a corporation which, it was contemplated, would produce three or four motion pictures for release under the distribution agreement with United Artists.

In September of 1942, the "Andrew Stone Productions", a California corporation, was formed. Finney borrowed $20,000 from a bank and loaned it to the corporation. On January 8, 1943, one hundred shares of stock of the corporation were issued—60 shares to

Stone, 20 shares each to Finney and Jackson—Finney paying $20 for his shares. Each stockholder was an officer of the corporation, Stone being president. In March of 1943 production started on the first picture entitled "Hi Diddle Diddle". The picture was released through United Artists in August of 1943. Finney rendered various services in the production of this picture. Three agreements were entered into between the parties dated as of December 31, 1942, March 10, 1943 and August 6, 1943. These agreements were not offered in evidence, but it appears from the record that these agreements related to stock purchase and compensation to be paid to the stockholders for their services in the production of "Hi Diddle Diddle". The salary to be paid to each with respect to "Hi Diddle Diddle" was $12,000 to Finney, $20,000 to Jackson and $60,000 to Stone. $3,000 was paid to Finney on the start of production of "Hi Diddle Diddle", and the balance of $9,000 was deferred and was payable out of the proceeds to be received from said picture.

Shortly after production started on "Hi Diddle Diddle", serious and bitter disagreements arose between Finney and Stone. Stone wanted to get rid of Finney, and perhaps Jackson. Quarrels and controversies continued for some six months. Various meetings were had and several drafts of settlement agreements were prepared. Finally an arms-length settlement was reached and embodied in an agreement dated September 23, 1943, which was received in evidence. At the time this agreement was executed the corporation had produced only the one picture, "Hi Diddle Diddle", which was released through the distribution agreement with United Artists, which agreement was still in existence and had not been assigned by the corporation or Stone.

The agreement of September 23, 1943, was in the form of a letter directed to Andrew Stone Productions and to Andrew Stone and Frederick Jackson. It was signed by Finney, approved and confirmed by the corporation, acting through its officers; by Stone and Jackson individually, and the provisions thereof relating to direct payments to Finney by United Artists Corporation was accepted by United Artists Corporation.

The first paragraph of the letter reads as follows:

"This will confirm our understanding that all previous agreements heretofore entered into between us including but not limited to those agreements dated as of December 31, 1942, March 10, 1943 and August 6, 1943, are rescinded and cancelled and in addition to the salary of $12,000 for my services rendered in connection with the production of the motion picture photoplay Hi-Diddle-Diddle of which sum I have heretofore received $3,000 and the remainder of $9,000 is to be paid to me concurrently with salary payments yet to be made to Andrew L. Stone and Frederick Jackson as negative costs of Hi-Diddle-Diddle, are recouped, I hereby agree to sell to you or your nominees all capital stock now held by me in Andrew Stone Productions, Inc., for the following considerations, to-wit: * * *".

The other provisions of the agreement provided:

1. For the payment to Finney directly from United Artists as distributor of "Hi Diddle Diddle" of twenty per cent of the producer's net profits receivable by the producer from the production and distribution thereof;

2. That Finney would be repaid the $20,000 invested by him, together with interest at six per cent, from the sale of "Hi Diddle Diddle";

3. For the payment to Finney of certain fixed cash payments from the first three pictures to be produced by Andrew Stone for release by United Artists under the existing distribution agreement;

4. For the payment to Finney of twelve per cent (later reduced to 10.8 per cent) of the producer's net profits receivable by the producer from the production and distribution of each of the first three motion pictures produced by Andrew Stone for release by United Artists;

5. For the pledge by Finney of his share of the residual value of the picture "Hi Diddle Diddle" on the same basis as the pledge of the residual values held by Stone and Jackson, as security for the financing of the first picture to be produced by "Andrew Stone Productions"; and to the pledge of the residual value of each picture thereafter to be produced by Andrew Stone as security for the financing of the next picture to be produced by Andrew Stone for release by United Artists, until three pictures had been produced by Andrew Stone;

6. That Finney would not be obligated to render services of any nature whatsoever in the future and would not be deemed to be an agent, partner, representative, associate or affiliate of Stone and Jackson or of any company thereafter concerned with the production of the three motion pictures yet to be released through United Artists;

7. That should the corporation be dissolved, Finney consents thereto, provided that any transfer of the motion picture, "Hi Diddle Diddle", should be made subject to his rights as set forth in the agreement;

8. That the motion pictures referred to, other than "Hi Diddle Diddle", shall specifically be only the first three consecutive motion pictures produced by Andrew Stone through United Artists under and pursuant to the existing agreement dated February 2, 1943, with the United Artists Picture Corporation;

9. That Stone was under no obligation to produce the three pictures, or any of them, and that Finney had no right to demand the production or delivery of any of them, and

10. That Finney was entitled to nothing, unless one or more of said pictures was or were produced.

Other provisions of the letter agreement defined "producer's net profits", fixed a limitation on salaries for services of producers, directors and writers of the three motion pictures, held Finney harmless of any liability in connection with the production and distribution of the motion pictures; released all claims and demands, except as set forth in the letter agreement, and, insofar as the corporation was concerned, the agreement was in compromise of the controversy with Finney as a stockholder.

Subsequent to the settlement agreement, the corporation was dissolved and liquidated, and a new corporation was formed by Stone and others in which Finney had no interest, but which apparently inherited some of the obligations of the dissolved corporation, including the obligations imposed upon it by the settlement agreement.

Finney received the balance of his salary in the amount of $9,000 during 1943, 1944, and 1945, from the proceeds of "Hi Diddle Diddle". This money was reported as ordinary income and is not in issue here.

Finney also received from the proceeds of "Hi Diddle Diddle" the return of the $20,000 which he had advanced, plus interest. This money is not in issue here.

In 1944 and 1945, petitioners received $12,500 and $39,862.46, respectively, from "Hi Diddle Diddle". They reported these amounts as capital gains, each reporting one-half in his or her separate return. The Commissioner treated these payments as ordinary income. Prior to the decision of the Tax Court in the instant case, the Commissioner conceded that those amounts received by petitioners were entitled to capital gain treatment.

The new corporation produced a motion picture, "Sensations of 1945", which was the only picture produced for release under the distribution agreement with United Artists. It was stipulated in the Tax Court that in 1945 petitioners received $10,824 from this picture. Petitioners reported such income as a capital

gain. The Commissioner treated this payment as ordinary income, and was sustained by the Tax Court. The treatment of this sum as a long term capital gain or as ordinary income forms the problem presented to this Court for decision.

In the findings of fact of the Tax Court it is stated:

"The only asset then [September 23, 1943] owned by Productions, aside from an insubstantial amount of cash, was that film [Hi Diddle Diddle]. It was subject to substantial liabilities, but an agreement with United Artists provided for its distribution and exhibition."

Also in the findings of fact appears the following:

"The amounts received by petitioner on account of 'Sensations of 1945' represent amounts received as consideration for the sale or transfer of his shares of stock in Productions. They are not proceeds from the sale or exchange of capital assets, and are taxable as ordinary income."

It is clear from the record that the corporation has some rights in the distribution agreement with United Artists, and that such distribution agreement was a valuable asset which the Commissioner concedes, but contrary to the evidence, the Tax Court found that the only asset, aside from an inconsiderable amount of cash, was the film "Hi Diddle Diddle".

It is obvious that the finding of the Tax Court that "the amounts received by petitioner on account of 'Sensations of 1945' represent amounts received as consideration for the sale or transfer of his shares of stock in Productions" is in direct conflict with the finding that "they are not proceeds from the sale or exchange of capital assets, and are taxable as ordinary income." Counsel for the Commissioner contends that the words "do not" were inadvertently omitted after the words "Sensations of 1945" in such finding. In view of the record in this case and the reasoning implicit in the decision of the Tax Court, we do not feel justified in accepting such explanation. The theory of the Commissioner before the Tax Court was that Stone and Jackson would not pay Finney more for his shares of stock on a voluntary sale than Finney would receive on dissolution and a pro rata distribution of the assets of the corporation, and since Finney received more for his shares of stock through the settlement agreement than he would have received on liquidation of the corporation, that such "more" must have been paid to him in lieu of salary or for something other than his shares of stock, and that "more" must be ordinary income. Such reasoning is unsound and ignores the value of the distribution agreement with United Artists.

The consideration received on the sale of stock to adverse shareholders in an arms-length transaction may be radically different than the amount received on a pro rata distribution of assets among shareholders on a voluntary dissolution of a corporation. Finney was in a strong bargaining position in the extended negotiations leading up to the settlement agreement. Stone wanted to get rid of Finney. Finney had some control over the assignment of the distribution agreement with United Artists. Finney, as a creditor of the corporation, could have delayed dissolution proceedings. Section 401a of the California Civil Code of 1943.[1] As a shareholder owning more than five per cent of the outstanding shares of the corporation he could have required court supervision over the dissolution proceedings. See Section 403 of the California Civil Code as it stood in 1943.[2]

It cannot be successfully argued that the "more" which Finney received under the settlement agreement was in lieu of salary. He rendered no further services to Stone or to the new corporation. The settlement agreement did not obligate

---

1. Now West's Ann.Corporation Code, §§ 5000–5004.

2. Now West's Ann.Corporation Code, §§ 4607–4619.

him to render services in the future, and he was not to be deemed, in any manner, affiliated with future activities.

It appears to us from the record that the Tax Court adopted the unsound theory upon which this issue was presented by the Commissioner.

For the reasons herein set forth, the decision of the Tax Court that amounts received by petitioners from the film, "Sensations of 1945" constitute ordinary income must be reversed, and this issue remanded to the Tax Court for further consideration, consistent with the views herein expressed.

The decision of the Tax Court with respect to losses claimed in 1945 by petitioners, on the films, "White Fury" and "Strange Holiday", is affirmed.