EMANUEL M. SKOLNIK AND HELEN R. SKOLNIK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 304–68.    Filed March 24, 1971.

*Karl Schelly,* for the petitioners.
*James F. Kennedy,* for the respondent.

---

IRWIN, *Judge:* The Commissioner determined a deficiency in petitioners' income tax for the calendar year 1963 in the amount of $5,389.04. Since petitioners conceded certain other issues, the only issue for our determination is whether petitioners are entitled to a deduction of $7,700 under section 165 of the Internal Revenue Code of 1954 [1] as a loss arising from theft.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulations and exhibits attached thereto are incorporated herein by this reference.

Emanuel M. Skolnik (hereinafter referred to as petitioner) and his wife, Helen R. Skolnik, filed a joint Federal income tax return for the calendar year 1963 with the district director of internal revenue, Chicago, Ill.

At the time of the filing of the petition herein, they resided in Skokie, Ill.

Petitioner, who is a physician, first became acquainted with Maurice H. Kamm (hereinafter sometimes referred to as Kamm) in approximately 1937, at which time Kamm became engaged to petitioner's sister.

Following the marriage of his sister to Kamm, who was an attorney, petitioner developed both a social and professional relationship with him. Petitioner, in fact, used Kamm exclusively as his attorney until the latter's death in February 1963, despite the fact that Kamm had remarried.

Petitioner never doubted Kamm's honesty or integrity, as is evidenced by the fact that he relied upon him for advice in making a number of investments over the course of their relationship.

One of these investments involved Kabak Corp. (hereinafter sometimes referred to as Kabak), an Illinois corporation, that intended to acquire air rights over the Illinois Central Railroad (hereinafter sometimes referred to as Illinois Central) tracks at 23d Street in Chicago and contemplated constructing a motel there.

In order to provide funds to finance the acquisition of these air rights and for other appropriate corporate purposes, exclusive of any additional financing which might be required to improve such air rights or realize upon the economic value of the same, the investors in Kabak proposed to provide funds in the maximum aggregate amount of $1,450,000.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Kabak was to authorize the issuance of 35,500 shares of common stock at $10 par value per share, as well as $1,095,000 principal amount of 5-percent, 20-year subordinated debentures due in 1978.

The common stock and debentures of Kabak were subscribed for in not more than 15 units, each unit consisting of the following:

| | | |
|---|---|---|
| Common stock (1,540 shares) | $15,400 | aggregate par value |
| Debentures | 73,000 | principal amount |
| Total cost per unit | 88,400 | |

A subscriber's rights under the subscription agreement could not be assigned without the prior written consent of Kabak Corp. Moreover, a Kabak stockholder could not transfer any shares of stock unless he offered the right of first refusal to the general partners of the 2300 South Lake Shore Drive Limited Partnership, in which Kabak was a limited partner.

In 1959, Kamm subscribed for 1½ units which amounted to 2,310 shares of common stock and $109,500 of debentures in Kabak. He paid $23,100 in the same year for the 2,310 shares of common stock.

In an effort to interest petitioner and his brother, Louis E. Skolnik[2] (hereinafter referred to as Louis), in investing in Kabak, Kamm arranged a meeting with the two of them sometime near the end of 1959. Since Louis was acting as petitioner's auditor and Kamm as his counsel, they agreed to handle the entire investment transaction for him.

On January 13, 1960, petitioner, Louis, and Kamm entered into a written agreement which provided, in pertinent part, as follows:

1. KAMM agrees to sell and LOUIS E. SKOLNIK and DR. EMANUEL M. SKOLNIK each agrees to buy one-third the shares and one-third the debentures subscribed for by KAMM and agree to pay KAMM the sum of $7,700.00 each, or one-third of the $23,100.00 KAMM has paid for the said 2,310 shares of stock of KABAK CORPORATION.

2. The SKOLNIKS each agree to pay one-third of the cost of the debentures subscribed to by KAMM, or $36,500.00 each when called upon to do so.

3. KAMM agrees to notify the KABAK CORPORATION that the stock, when issued, shall be issued 770 shares to KAMM and 770 shares to each, LOUIS E. SKOLNIK and DR. EMANUEL M. SKOLNIK.

4. KAMM agrees also to notify the KABAK CORPORATION to issue the debentures to be paid for by the SKOLNIKS in their respective names or such other name or names as the SKOLNIKS may designate.

\*      \*      \*      \*      \*      \*      \*

6. KAMM and the SKOLNIKS \* \* \* agree that neither will sell his rights acquired in the KABAK CORPORATION to any stranger without first offering said stock and debentures to the other upon the same terms \* \* \* as the proposed sale to the stranger \* \* \*.

---

[2] Louis E. Skolnik died prior to Kamm's death, but the exact date of his demise does not appear in the record.

Arthur R. Kneibler, Jr. (hereinafter referred to as Kneibler), who had served as president of Kabak from its incorporation until its dissolution in 1967, was never informed of this agreement by Kamm. In fact, at no time prior to his death in February 1963 did Kamm notify Kabak of the Skolnik brothers' interests therein.

On January 29, 1960, certificate No. 17 for 2,310 shares of Kabak common stock was issued to Kamm. However, the stock certificate book of Kabak indicated that this issue was canceled and two new certificates, each in 770 share lots, numbered 59 and 60, respectively, were issued to Kamm on May 24, 1962. It is not clear from the record whether and when these two certificates were delivered to Kamm. However, they had not been returned to Kabak Corp. as of the date of the trial herein.

The remaining block of 770 shares of Kabak stock was sold by Kamm, with the assistance of Kneibler, to the Norris Grain Co.

During the years 1960 through 1963, there were never more than 20 stockholders of Kabak Corp.

On May 28, 1962, Kamm wrote to petitioner informing him that Kabak Corp. had issued a call upon its stockholders to pay for debentures in the principal amount of $43,750 for each unit owned. The letter continued as follows:

Since you are entitled to a one-half unit, this would require the payment of $21,875.00.

* * * I am not able presently to pay for the Debentures.

This letter and a letter of the same date to one Morris Goldstein in re the estate of Louis E. Skolnik revealed that Kamm was of the opinion that the failure to answer the call to pay for the debentures would not result in forfeiture of the Kabak common stock. Kamm believed that a subscribing stockholder would at least be entitled to a return of his initial investment.

Petitioner did not answer the debenture call. However, some stockholders did answer the call. The money paid for the debentures was placed in escrow, but it was eventually returned to the stockholders because the subscription agreement expired while litigation concerning ownership of the air rights over the Illinois Central tracks was pending. Kabak could not commence construction of the motel on that site until title was adjudicated. Therefore, since Kabak Corp. had no use for the funds received from the call, Kneibler decided to return them.

In 1967, Kabak Corp. was dissolved and its assets were transferred to an Illinois limited partnership called McCormick City Partnership (hereinafter referred to as Partnership). Each share of Kabak stock was exchangeable for a proportionate interest in the partnership so

that the 1,540 Kabak shares issued and still outstanding in Kamm's name were convertible into approximately a 1½-percent interest in the entire partnership.

On November 16, 1967, Kneibler, on behalf of Kabak Corp., notified one Harry J. Snyderman [3] by letter of the deceased Kamm's interest in Partnership.

Partnership was formed to develop the air rights on either side of the 23d Street Viaduct located across from McCormick Place over the Illinois Central railroad right-of-way. Kabak transferred to the partnership its principal asset consisting of a contract to purchase these rights above approximately 5 acres from the Illinois Central. Moreover, Partnership had acquired rights to purchase air rights over approximately 10 additional acres.

Kamm died on February 13, 1963. Upon being advised by Kamm's brother, Harold, who was handling Kamm's estate, that the estate was insolvent, petitioner did not file a claim against it. However, petitioners did receive $10,000 in insurance proceeds from a policy on Kamm's life which was taken out in order to insure petitioners that they would be repaid for a $10,000 loan they made to Kamm on August 1, 1962.

After Kamm died, petitioner contacted Kneibler in order to establish his right to one-third of the 2,310 shares of Kabak stock originally subscribed for by Kamm. However, Kneibler refused to issue a certificate for 770 shares to petitioner without appropriate evidence of the purchase. Furthermore, with respect to the Skolnik brothers' claimed interest in the Kabak stock issued to Kamm, Kneibler informed Morris Goldstein by letter dated May 16, 1963, as follows:

This will acknowledge receipt of your letter of May 15, 1963 in which you advised me that the Estate of Louis E. Skolnik purchased one-half of a Kabak unit from Maurice H. Kamm, and also that Dr. Emanuel M. Skolnik bought another one-half unit from Maurice H. Kamm at the same time.

On May 23, 1962 the directors of Kabak Corporation issued a call for a partial payment on or before June 15, 1962 on account of the 5% subordinated debentures subscribed for by Maurice H. Kamm in an amount of $43,750 of the $73,000 of debentures subscribed for in each unit. No payment was ever received from Kamm, either for his own account or for your client's account.

In the Subscription Agreement of Kabak Corporation, a specific provision is made prohibiting the transfer of any units without the specific prior written consent of Kabak Corporation. This was never obtained by Kamm in this instance.

Further, a Partnership Agreement entered into with 2300 South Lake Shore Drive Limited Partnership gives the general partners the right of first refusal for the purchase of any Kabak units which become available. No such offer was ever made in this case.

---

[3] The relationship of this individual to Kamm is not altogether clear from the record.

However, if the Estate of Louis Skolnik or Dr. Skolnik wish to pay the amount Maurice Kamm was in default, I am confident that I can work out the legal problems involved for the proper transfer to these two individual accounts. If no such payment is forthcoming, I would have to assume that your client and Dr. Skolnik are with little recourse for the above stated reasons.

Petitioners did not want to get involved in time-consuming and costly legal entanglements. Instead, they deducted $7,500 on their 1963 joint income tax return as "Trust Funds Not Returned, considered Total Loss * * * ." This deduction was disallowed in its entirety by respondent on the ground that petitioner had not proved that he was entitled to such a deduction. Petitioners claimed in their petition that they should have deducted $7,700, the amount paid to Kamm in 1960 for the Kabak stock, rather than $7,500.

### OPINION

In 1959, Maurice H. Kamm subscribed for 2,310 shares of common stock and $109,500 of debentures in Kabak Corp. In the same year, he paid $23,100 for the 2,310 shares of stock.

On January 13, 1960, petitioner and his brother, Louis, contracted with Kamm as follows: Each agreed to purchase one-third of the common stock and one-third of the debentures subscribed for by Kamm.

Petitioner paid $7,700 to Kamm in 1960 for the 770 shares he had contracted to buy. However, the stock was never issued or delivered to petitioner. After Kamm's death in 1963, petitioner discovered that his estate was insolvent. Upon contacting the president of Kabak Corp., petitioner was informed that Kamm had no authority to sell or otherwise transfer the common stock of the corporation without the prior written consent thereof. However, petitioner was also advised that the Kabak stock could probably be issued to him or the estate of his brother, Louis, if he agreed to pay the amount that Kamm was in default on a debenture call.

Petitioner did not do so and did not further attempt to establish his right to the Kabak stock. Instead, he deducted $7,500 [4] as "Trust Funds Not Returned, considered Total Loss" on his income tax return for 1963, which deduction respondent disallowed in its entirety.

On brief, both parties state the issue presented in this case in similar terms, viz, did petitioners sustain a deductible theft loss of $7,700 in 1963 as a result of the transaction entered into between petitioner and Maurice H. Kamm?

---

[4] Petitioner alleged that he erroneously deducted $7,500 rather than $7,700, the amount he paid to Kamm, and he therefore claimed a refund of taxes.

If we find against petitioner on this issue, we shall then determine whether petitioner is entitled to any deduction in 1963 with respect to that transaction.

Section 165 [5] provides that an individual is entitled to a deduction for any loss of property arising from theft. Moreover, the loss shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

Petitioner's position is that Kamm, with intent to cheat or defraud by false pretenses, obtained $7,700 from him, and that this constituted theft for purposes of section 165(c) (3).

Respondent appears to agree that the crime of obtaining money by false pretenses, as defined by chapter 38, sec. 253, Ill. Rev. Stat.,[6] con-

---

[5] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(3) losses of property not connected with a trade or business, if such losses arise from \* \* \* theft. \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(e) THEFT LOSSES.—For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

[6] Whoever, with intent to cheat or defraud another, designedly by color of any false token or writing, or by any false pretense, obtains the signature of any person to any written instrument, or obtains from any person any money, personal property or other valuable thing, shall be fined in any sum not exceeding $2,000, and imprisoned not exceeding one year, and shall be sentenced to restore the property so fraudulently obtained, if it can be restored. No indictment for the obtaining of any property or thing by any false pretense or pretenses shall be quashed, nor shall any person indicted for such offense be acquitted, for the reason that the facts set forth in the indictment, or appearing in evidence, may amount to a larceny or other felony; nor shall it be deemed essential to a conviction, that the property in the goods or things so obtained shall pass with the possession to the person so obtaining it.

The Criminal Code of 1961 and the Code of Criminal Procedure of 1963 repealed sec. 253 of ch. 38 of the Illinois Revised Statutes and enacted sec. 16–1 which provides in pertinent part, as follows:

38 Sec. 16–1.　Theft

A person commits theft when he knowingly:

(a) Obtains or exerts unauthorized control over property of the owner; or

(b) Obtains by deception control over property of the owner; or

(c) Obtains by threat control over property of the owner; or

(d) Obtains control over stolen property knowing the property to have been stolen by another or under such circumstances as would reasonably induce him to believe that the property was stolen, and

(1) Intends to deprive the owner permanently of the use or benefit of the property; or

(2) Knowingly uses, conceals or abandons the property in such manner as to deprive the owner permanently of such use or benefit; or

(3) Uses, conceals, or abandons the property knowing such use, concealment or abandonment probably will deprive the owner permanently of such use or benefit.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Laws 1961, p. 1983, § 16–1, eff. Jan. 1, 1962, amended by Laws 1967, p. 1802, § 1, eff. July 20, 1967.

[Ill. Ann. Stat. ch. 38, sec. 16–1 (Smith-Hurd 1970).]

stitutes theft under section 165(c) (3). However, respondent's position is that the facts do not support the crime of obtaining money by false pretenses under the law of Illinois. Furthermore, respondent maintains that not only did no theft occur, but no loss, capital or otherwise, occurred in 1963. He contends that any loss petitioner might have sustained in a later year is a capital loss.

While we have serious doubts as to whether any loss was in fact incurred by petitioner in 1963, we shall reserve those doubts for airing later in this opinion. Assuming *arguendo* that petitioner suffered a loss in 1963, the year of Kamm's death, we must determine whether that loss arose from theft.

The term "theft" is deemed to include, but shall not necessarily be limited to, larceny, embezzlement, and robbery. Sec. 1.165–8(d), Income Tax Regs. Moreover, only the factual existence of a theft can trigger the application of section 165(c) (3) so far as it relates to theft losses, and section 165(e). *Paul C. F. Vietzke*, 37 T.C. 504 (1961). It is not necessary that the alleged thief be convicted or even prosecuted, as long as a "theft" in fact occurred under the law of the State wherein it was sustained. *Evelyn Nell Norton*, 40 T.C. 500 (1963) ; *Paul C. F. Vietzke, supra; Michele Monteleone*, 34 T.C. 688 (1960) ; and *Curtis H. Muncie*, 18 T.C. 849 (1952).

An essential element of the offense of false pretenses in Illinois is that the accused obtain money with the intent to defraud. *People* v. *Scowley*, 353 Ill. 330, 187 N.E. 415 (1933). However, the specific intent to defraud need not be proved by direct evidence, but may be proved by facts and circumstances. *People* v. *Blume*, 345 Ill. 524, 178 N.E. 48 (1931). Moreover, any misrepresentation of a past fact, knowingly and designedly made to induce another to part with his property, is a false pretense under Illinois law. *People* v. *Martin*, 372 Ill. 484, 24 N.E. 2d 380 (1939) ; *People* v. *Gruber*, 362 Ill. 278, 200 N.E. 483 (1935) ; *People* v. *Schneider*, 327 Ill. 270, 158 N.E. 448 (1927) ; *Keyes* v. *People*, 197 Ill. 638, 64 N.E. 730 (1902).

Petitioner asserts that Kamm did not inform him of his inability to transfer the Kabak stock without the approval of Kabak Corp. and without offering the right of first refusal to the general partners of 2300 South Lake Shore Drive Limited Partnership. Therefore, petitioner contends, Kamm falsely represented that he was able to sell 770 shares of Kabak stock to petitioner when, in fact, he had expressly agreed to the contrary. Furthermore, he alleges that this misrepresentation was made knowingly and designed to induce petitioner to part with $7,700, and that this constitutes false pretenses in Illinois and a deductible theft loss under section 165(c) (3).

We note first of all that petitioner's credibility was impeached at the close of the trial herein.[7] Petitioner made no attempt whatsoever, either at trial or on brief, to explain away two inconsistent and contradictory statements he made, both of which, although made at different times, were made under penalties of perjury. Therefore, we arrived at the conclusions and inferences stated herein after having weighed and evaluated this fact.

We entertain very serious doubts as to whether Kamm knowingly and designedly, in an effort to induce petitioner to part with $7,700, concealed the restrictions on his ability to transfer the Kabak stock in question. Petitioner testified that his brother Louis and Kamm, serving as his auditor and counsel, respectively, handled the entire Kabak stock purchase transaction for him. It is perfectly possible, therefore, that Kamm may have informed Louis of these restrictions. Since Louis was acting for petitioner, any knowledge he may have received would have been imputed to petitioner.

Moreover, despite petitioner's testimony to the contrary, we are not convinced that Kamm did not advise petitioner himself of these limitations on the transferability of the Kabak stock.

The issuance of the Kabak stock in question in Kamm's name does not convince us that he intended to defraud petitioner. We feel that there may have been some type of agreement or understanding among the parties to the purchase-sale contract of January 13, 1960, that Kamm would hold the Kabak stock in his own name for petitioner and his brother. Otherwise, we cannot fathom why petitioner and Louis never bothered to obtain the Kabak stock certificates from Kamm. It was not until after Kamm's death in February 1963 that petitioner first claimed the 770 shares he had purchased in early 1960.

Certainly, petitioner was aware that Kamm found himself in dire financial straits prior to the year at issue. Petitioner, in fact, had made a $10,000 loan to Kamm in 1962. Moreover, in a letter dated May 28, 1962, to petitioner in which he informed him that there had been a call issued upon Kabak stockholders to pay for debentures, Kamm

[7] The facts relating to the impeachment are that respondent asked petitioner point-blank if he ever made an offer to answer the debenture call of Kabak Corp. Petitioner responded as follows: "No, because I was never asked to make it." Upon receiving this reply, respondent introduced into evidence a letter dated July 29, 1966, which had been signed by both petitioners under penalties of perjury and which was addressed to the U.S. Treasury Department, Appellate Branch Office, Appellate Division, Chicago, Ill. The following passage from this letter was read into the record by respondent:

"For the record, please be advised that an offer was made to Kabak Corporation by us for payment of the first debenture call and that was refused by the Kabak Corporation inasmuch as it refused to recognize the intended purchase of said interest from Mr. Kamm as valid and binding."

The aforementioned letter was introduced into evidence, with no objection by petitioner, solely for the purpose of impeachment.

mentioned that he was unable to pay for the debentures. Having been apprised of Kamm's financial straits, prudence would have dictated that petitioner request Kamm to deliver the shares to him. At the very least, petitioner could have demanded to see the certificate representing his 770 shares. We feel that petitioner's failure to check on his investment was due not to lack of prudence but to an understanding among Kamm, petitioner, and Louis that Kamm would hold the stock in his own name for them.

Petitioner states in his reply brief that the negligence of a purchaser, in this case petitioner's failure to obtain the 770 shares prior to Kamm's death, is no defense to a prosecution for false pretenses, citing *Keyes* v. *People, supra.* We agree with him. However, we can reasonably infer from the fact that petitioner did not seek to obtain possession of his 770 shares prior to Kamm's death that petitioner must have acquiesced in Kamm's holding petitioner's stock in his own name. If this is true, then Kamm recognized petitioner's interest in the 770 shares, as is evidenced by the record, and no fraud was perpetrated.

In an effort to refute respondent's contention that Kamm recognized petitioner's interest in the 770 Kabak shares in question, petitioner points out that Kamm had Kabak stock issued in his own name on two separate occasions. The first of these occasions was January 29, 1960, at which time all 2,310 shares of Kabak stock were issued to Kamm. The second occurred on May 24, 1962, the date of sale by Kamm of 770 Kabak shares to the Norris Grain Co. Petitioner alleges that both of these events were in violation of the contract dated January 13, 1960, and, therefore, are indicia of Kamm's intent to defraud him. At first blush, petitioner's inferences appear to be reasonable. However, a careful review of the record herein reveals that we have no evidence whatsoever as to whether Kamm did or did not give petitioner the right of first refusal on the 770 shares sold to the Norris Grain Co. Therefore, we do not know whether Kamm breached his agreement by this transaction. Furthermore, if petitioner consented to Kamm's holding the stock in question in his own name, petitioner either acquiesced in the breach of contract or he agreed that Kamm would so hold the stock, in which event the new agreement superseded the old.

In any event, we cannot say that the two occasions pointed out by petitioner refute respondent's assertion that Kamm recognized petitioner's interest in the stock in question. Rather, we find other evidence supporting respondent's contention.

Kamm wrote letters to both petitioner and Morris Goldstein, who was handling the estate of Louis E. Skolnik, in May 1962, in which he notified them that a call had been made upon Kabak stockholders to pay for the debentures. "Since you are entitled to a one-half unit,"

Kamm wrote to petitioner, "this [call] would require the payment of $21,875.00." It is clear from these letters that Kamm considered petitioner the owner of the 770 shares of Kabak stock in question.

It is also interesting to note that on January 29, 1960, certificate No. 17 for 2,310 shares of Kabak common stock was issued to Kamm. However, this issue was canceled and on May 24, 1962, two new certificates, each in 770-share lots, were issued to Kamm. The remaining block of 770 shares was sold by Kamm, with Kneibler's assistance, to the Norris Grain Co. Why would a man who had defrauded two individuals, viz, petitioner and his brother Louis, bother to have *two* separate certificates, each in 770-share lots, issued to himself? It appears that it would have been much simpler to have the 1,540 shares represented by *one* certificate, unless Kamm were serving in some type of fiduciary capacity for petitioner and Louis, in which case, it would have been advisable to segregate the two stock-ownership interests by having two separate stock certificates issued.

We cannot lightly infer an intention to defraud, especially where our doubts as to the facts surrounding the purchase in question are evident from the foregoing discussion. In view of these doubts and aware of the fact that petitioner has the burden of proof in this case, *Warner L. Jones*, 24 T.C. 525 (1955), we hold that he has not proved that Kamm obtained $7,700 from him by false pretenses. Therefore, he is not entitled to a theft loss deduction under section 165.

Having disposed of the theft issue, we now turn to the question whether petitioner sustained any deductible loss in 1963.

Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. Individuals are limited to deductions for losses described in section 165(c).

We are mindful that the requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test. *Lucas* v. *American Code Co.*, 280 U.S. 445 (1930). "Such an issue of necessity requires a practical approach, all pertinent facts and circumstances being open to inspection and consideration regardless of their objective or subjective nature." *Boehm* v. *Commissioner*, 326 U.S. 287, 292 (1945). Moreover petitioner has the burden of proving that he sustained a loss in the year at issue. *Boehm* v. *Commissioner*, supra; *Finney* v. *Commissioner*, 253 F. 2d 639 (C.A. 9, 1958), affirming on this issue a Memorandum Opinion of this Court.

Respondent takes the position that petitioner has failed to prove that he sustained a loss in 1963 arising out of his transaction with Kamm. Furthermore, he maintains that petitioner was the equitable,

if not the legal, owner of 770 shares of Kabak stock and that neither the stock nor his right to it became worthless in 1963 so as to come within the purview of section 165(g).[8] We agree.

Kamm died in February 1963. Shortly thereafter, petitioner contacted Kamm's brother, Harold, who was handling Kamm's estate, with respect to the 770 shares of Kabak stock he had purchased. Harold informed petitioner that Kamm's estate was insolvent. However, we have no evidence whatsoever that the administrator of Kamm's estate did not hold the two certificates, each in 770-share lots and numbered 59 and 60, respectively, which were issued to Kamm on May 24, 1962. Kneibler testified that the two certificates were never returned to Kabak. Therefore, it is reasonable for us to infer, absent evidence to the contrary, that the administrator of Kamm's estate was holding the stock in question in 1963. Despite the fact that the estate was insolvent, petitioner, as the equitable owner of the stock by virtue of the contract of January 13, 1960, could have instituted a suit in equity against the administrator to recover his 770 shares, claiming that the shares were not part of the estate, but rather were held by Kamm for petitioner under some sort of trust[9] arrangement. An examination of the law of Illinois leads us to believe that petitioner could have prevailed in such litigation. See, e.g., *Edgerton* v. *Johnson*, 178 F.2d 106 (C.A. 7, 1949); and *Dodd* v. *Rotterman*, 330 Ill. 362, 161 N.E. 756 (1928).

Curious as it may seem, we do not even know if petitioner ever requested the administrator of Kamm's estate to deliver to him the stock in question, rather than to demand the return of his $7,700 from an insolvent estate.

After Kamm's death, petitioner contacted the president of Kabak Corp. in an effort to establish his right to 770 shares of Kabak stock issued to Kamm. While Kneibler refused to issue the stock to petitioner, he stated that he was confident the legal problems involved in transferring 770 shares to him could be worked out, provided petitioner or the estate of Louis E. Skolnik paid the amount Kamm was in default on the debenture call made in May 1962. Since petitioner had originally contracted to answer any calls for debentures with respect to his 770 shares, this appears to have been a reasonable request. How-

---

[8] SEC. 165. LOSSES.

    (g) WORTHLESS SECURITIES.—

        (1) GENERAL RULE.—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

        (2) SECURITY DEFINED.—For purposes of this subsection, the term "security" means—

            (A) a share of stock in a corporation;

            (B) a right to subscribe for, or to receive, a share of stock in a corporation; * * *

[9] We have already found as a fact that petitioners deducted $7,500 in connection with the stock as "Trust Funds Not Returned."

ever, petitioner contends that Kneibler wanted him to pay the total amount Kamm was in default, rather than only one-third of that amount. It is not clear from the record what Kneibler was demanding from petitioner. Since petitioner had the burden of proof, we cannot sustain his contention.

On the facts and circumstances of this case, we hold that petitioner did not prove that his right to the Kabak stock became worthless in 1963. Nor did he prove that he sustained any deductible loss in 1963. Accordingly, respondent properly disallowed the $7,500 deduction claimed by petitioner in that year.

Since the only year before us is 1963, we shall not pass on whether petitioner sustained a deductible loss in any other year.

*Decision will be entered for the respondent.*