PAUL C. F. AND ALICE VIETZKE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87819. Filed December 21, 1961.

*John L. Carey, Esq.*, for the petitioners.
*Robert E. Johnson, Esq.*, for the respondent.

MULRONEY, *Judge:* This opinion supersedes a previous opinion filed September 29, 1961, and withdrawn December 7, 1961.

The respondent determined a deficiency in petitioners' income tax for the year 1956 of $12,276.45. The question for decision is whether $25,000 paid for 10,000 shares of common stock issued by Pan Protective Life Insurance Co., Inc., is deductible as a theft loss in 1956.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are found accordingly.

Petitioners Paul C. F. and Alice Vietzke are husband and wife and live in Valparaiso, Indiana. They filed a joint return on the cash basis for the year 1956 with the district director of internal revenue at Indianapolis, Indiana. Paul C. F. Vietzke, hereafter sometimes called petitioner, is a physician and surgeon.

In 1947 Thomas G. Paterson went to work for an Indiana general insurance agency and subsequently became district manager of its Gary office. Later he left that position to go into business for himself as the Paterson Insurance Service. Late in 1955 Paterson, Chris Zak, and others undertook the formation of an insurance corporation. On December 13, 1955, notices of intention to organize an insurance company to be known as Pan Protective Life Insurance Co., Inc., were published in Gary and Indianapolis newspapers. On December 23, 1955, articles of incorporation for Pan Protective were filed with the Indiana insurance commissioner. On January 16, 1956, Pan Protective's articles of incorporation were examined and approved by the office of the deputy attorney general and the insurance commis-

sioner and were approved and filed with the secretary of state of Indiana. The articles of incorporation were filed with the Lake County, Indiana, recorder and fees of $10,001.50 for incorporation were paid to the State on behalf of Pan Protective by a check dated January 16, 1956, drawn on the Paterson trustee account described below. On February 8, 1956, Paterson deposited $10,000 with the Indiana Insurance Department. On February 14, 1956, the insurance commissioner issued a permit to complete organization to Pan Protective.

Between November 21, 1955, and January 27, 1956, Paterson and 23 preorganizational subscribers to stock in Pan Protective executed preorganization contracts which provided, among other things, that payments for stock subscriptions were to be made to Paterson as trustee until the formation of the corporation. The articles of incorporation of Pan Protective listed 13 persons as "incorporators" and were signed by 9 of them. Although Paterson did not sign the articles, he notarized the document. The articles stated that the amount of paid-in capital with which Pan Protective would begin business would be $200,000.

On November 23, 1955, a bank account titled "Thomas Paterson, Trustee" was opened at a Gary bank with Paterson authorized to sign checks thereon. On March 14, 1956, a bank account in the name of Pan Protective Life Insurance Co. was opened at the same bank with the corporate officers authorized to cosign checks.

On December 31, 1955, Paterson and his wife sold the Paterson Insurance Service for $15,000.

J. W. Mather, a physician in East Gary, Indiana, one of the original incorporators of Pan Protective and one of the signators of its articles of incorporation, was an acquaintance of petitioner. Early in 1956 Mather told petitioner about Pan Protective and invited him to meet Paterson and Zak. Petitioner previously had purchased securities listed on the New York and American Stock Exchanges, over-the-counter stock, and stock in other insurance companies in Indiana.

On Friday, March 16, 1956, petitioner visited the office of Pan Protective, which was located in a house owned by Paterson in Gary. Petitioner was taken through the house and told that Pan Protective owned it. He was shown the permit to complete organization issued by the insurance commissioner and told that Pan Protective had been "okayed" by the State. Petitioner was asked to purchase stock in Pan Protective. He agreed to purchase 2,000 shares of stock at $2.50 per share. He was given a preorganizational subscription agreement which he signed. The agreement stated, in part:

All of the cash received from this and other subscriptions shall be deposited in full in the Gary National Bank of Gary, Indiana. Fifteen per cent of all cash

received from this and other subscriptions shall be used for commission, promotion, organization and other expenses.

He was told by Paterson or Zak that even should the company fail, he would lose only 15 percent of his investment because the agreement provided that 85 percent would be put into an escrow account in the Gary bank.

The following Monday at about 7 or 7:30 a.m., Zak telephoned petitioner and asked to see him. Zak and Paterson arrived and told petitioner that there was a little more Pan Protective stock available which they would like to let him have. They explained that in 2 weeks they would be selling a second issue of it for $5 per share and that petitioner could double his investment. Petitioner subscribed for another 2,000 shares. On March 19 and 20 he drew two checks totaling $7,500 payable to Pan Protective. Of the amount of these checks, $6,375 was deposited in the Pan Protective account and $1,125 was deposited in the Paterson trustee account.

Petitioner attended one formal and several informal meetings of the board of directors of Pan Protective. At one of the first such meetings he was given a printed prospectus for Pan Protective dated March 1956 which stated that it was descriptive of the first public offering of Pan Protective stock at a price of $5 per share. The prospectus stated, in part:

PAN PROTECTIVE LIFE INSURANCE COMPANY is a newly organized Life Insurance Company, incorporated under the Insurance Laws of The State of Indiana * * *.

PAN PROTECTIVE * * * when it obtains its certificate of authority from the Department of Insurance, will put into operation one of the finest plans for the benefit of the residents of this area. * * *

\*     \*     \*     \*     \*     \*     \*

PAN PROTECTIVE * * * was incorporated on January 16, 1956, under the laws of the State of Indiana, as a legal reserve stock Life Insurance Company. On February 14, the company received its permit to complete organization.

\*     \*     \*     \*     \*     \*     \*

The Pan Protective Life Insurance Company in compliance with the laws of the State of Indiana and under the supervision of the Indiana Securities Commission is making this offering to the public by virtue of having qualified as an issuer (and dealer).

\*     \*     \*     \*     \*     \*     \*

When granted a Certificate of Authority, the company will operate under the Insurance Code of Indiana and be subject to the supervision and regulation of the Department of Insurance.

Petitioner read the prospectus. He was again visited by Paterson and Zak, who proposed that he be made a director of the corporation and its medical adviser. On April 20, 1956, he subscribed for an additional 6,000 shares of Pan Protective stock at $2.50 per share, bring-

ing his total subscription to 10,000 shares. On June 20, 1956, petitioner paid $17,500 to Pan Protective and the amount was deposited in the Pan Protective account. His subscription to its shares totaled $25,000. A stock certificate was duly issued for the shares purchased.

In the course of his contacts with Paterson and Zak, petitioner was first told that there were 12 directors who had paid in $25,000 apiece to the corporation. Later at a stockholders meeting they told him that eight had paid the full amount. Several weeks later at another stockholders meeting, when pressed for details, Zak and Paterson admitted that only Mather and petitioner had paid $25,000. Others had paid in considerably smaller amounts.

In July two members of the Indiana Securities Commission visited petitioner and informed him that all was not well with Pan Protective. On July 27, 1956, the Indiana Securities Commission issued a cease and desist order which stated, in part:

Comes now the Indiana Securities Commission, and upon its own motion, and upon investigation, and being duly advised in the premises, now finds;

1. That the Pan Protective Life Insurance Company by and through its officers, directors, and agents, did offer for sale and sell to the public in the state of Indiana its securities.

2. That said securities were not registered with the Indiana Securities Commission for sale in the State of Indiana * * *.

3. That [Pan Protective], its officers, directors, and agents, did conduct themselves as a dealer in securities * * * without being licensed as a dealer * * *.

4. That offers for sale of the securities were made by use of false and misleading materials, which had not been filed or approved by this Commission.

5. That it is in the best interest to the public of the State of Indiana that Pan Protective Life Insurance Company be ordered to Cease and Desist from further offer for sale or sale of its securities.

Pan Protective stock, as shown by its stock certificate book, had been issued between March 15, 1956, and July 27, 1956. In that time about 60 stock certificates had been issued covering about 83,000 shares. Approximately 64,000 shares had been issued to Paterson, Zak, and two other directors without anything being paid therefor. About $126,000 was shown to have been paid in on the remaining issued shares.

The Pan Protective bank account passbook, duplicate deposit tickets, and bank statements show that $76,500 was deposited in that account between March 14 and July 11, 1956. The major disbursements from the account were for "Mortgage loans" of $30,000 and for "Furniture and fixtures," $25,424.40. Of this latter amount $13,-424.40 was paid to Gary office supply firms for furniture and fixtures and $12,000 was used to purchase the furniture and fixtures of the Paterson Insurance Service. Between December 1955 and December 1956, 10 checks totaling $8,025 were drawn on the Paterson trustee

account for rent of Paterson's house. Seven of them were drawn to Paterson as payee and three to a savings and loan association as payee. Checks were also drawn on the Pan Protective account to Paterson as payee for $15,000 for rent of the house from September 1955 to December 1956; on October 6, 1956, a check for $4,000 was drawn to "Thomas Paterson, Trustee"; and on November 1, 1956, a check for $11,000 was drawn to Paterson.

On November 1, 1956, a check for $5,750 was drawn on the Pan Protective account to Chris Zak. Between December 1955 and September 1956 Paterson drew checks on the trustee account totaling $57,145 payable to Zak.

On August 7, 1956, Pan Protective, by Paterson, its president, and the Indiana insurance commissioner, entered into an agreement by the terms of which the permit for completion of organization granted to Pan Protective was withdrawn. The agreement further stated that Pan Protective could apply for a new permit whenever it complied with the Indiana Securities Law and provided that the company would make full restitution to all stock purchasers other than the promoters.

On December 5, 1956, Paterson went to the office of the Indiana Department of Insurance, requested and received the $10,000 cashier's check which Pan Protective had on deposit with that office. Said check was made payable to the insurance department. It was returned to Paterson unendorsed.

After it became apparent that Pan Protective was foundering, a number of shareholder-subscribers, including petitioner, requested of Paterson that their money be refunded. Paterson, without authorization from the board of directors, made refunds to some. Petitioner received no refund.

On December 10, 1956, petitioner filed a complaint in Superior Court of Lake County against Pan Protective, Paterson, Zak, and other directors and incorporators asking judgment jointly and severally in the sum of $25,000, plus 6 percent interest from April 20, 1956, and attorney fees. This suit was one of several instituted by disgruntled shareholders at about the same time. Early in 1957 the State of Indiana entered the controversy and an order appointing a receiver was entered in Lake Superior Court on January 31, 1957, in a proceeding styled The State of Indiana ex rel The Department of Insurance of the State of Indiana, vs. Pan Protective Life Insurance Company. The order directed the department of insurance to take charge of all the assets of Pan Protective and to liquidate it.

On February 4, 1957, eight of Pan Protective's shareholders, not including petitioner, Paterson, Zak, or Mather, submitted several "PLANS FOR REHABILITATION" to the insurance department for the

stated purpose "to prevent liquidation, so that we may retrieve our investment in full."

On March 1, 1957, the Lake Superior Court entered an order in the State action directing Paterson and the bank to turn over to the receiver all checks, bank statements, ledger sheets, and records of the Paterson trustee account because such account "has been, and now is" the property of Pan Protective.

The Indiana insurance commissioner, in the interests of trying to rehabilitate Pan Protective, instructed the receiver to delay its sale and liquidation throughout most of 1957. On December 19, 1957, the receiver held a sale at public auction after newspaper notice and circularization. The personal property of Pan Protective was duly sold in bulk for $15,000 and payment therefor was received. The receiver's report was filed with the Lake Superior Court on December 31, 1957.

On August 11, 1958, petitioner dismissed his complaint as to all the defendants in his suit with the exception of Paterson and Zak. The court entered a default judgment against them for $27,500, plus attorneys' fees of $2,500 and costs. The judgment stated that the court had "heard all of the evidence" and was "duly advised in the premises."

On June 8, 1960, a final report and petition for distribution by the liquidating agent was filed with the Lake Superior Court. The report related total receipts of $17,860, total expenditures of $11,557.66, and a balance remaining for distribution of $6,302.34. As a part of the distribution of the remaining balance therein proposed, petitioner was to receive $2,048.65.

The insurance commissioner continued efforts to reorganize Pan Protective through 1959 and 1960. On July 14, 1960, Mather filed a petition in Lake Superior Court to amend the order of January 31, 1957, and for entry of an order of reorganization for Pan Protective.

Shortly before trial of this case in March 1961, petitioner was notified that $2,048.65, less attorneys' fees, was available to him.

The minutes of the Criminal Court of Lake County show that criminal affidavits were filed against Paterson and Zak on charges of violating the Indiana Securities Law by selling unregistered securities and for selling securities by an unregistered dealer or agent. Said minutes show that in May 1959 Paterson was found guilty by a jury, fined $1,000, and judgment was entered on the verdict as to the second charge above. The first charge was dismissed as against Paterson on the State's motion. Zak was absent from the jurisdiction and did not stand trial.

On his 1956 income tax return petitioner deducted $25,000 as a

casualty loss. In the statutory notice of deficiency respondent determined that the amount was "not allowable under the provisions of section 165 or any other section of the Internal Revenue Code of 1954."

OPINION.

Petitioner argues only that the $25,000 he paid for Pan Protective stock is deductible in 1956 as a theft loss under section 165(e) [1] of the Internal Revenue Code of 1954.[2] Respondent argues that no theft loss occurred, that no loss, either casualty or capital, occurred in 1956, and that any loss petitioner might sustain in a later year is a capital loss.

On brief respondent pictures the situation as a blundering but well-intentioned attempt to conceive a corporation without much benefit of statutory clergy. To the contrary, we view it as a blundering but intentional attempt on the part of Paterson and Zak to increase their personal resources without benefit of law. We agree with petitioner's contention that he was swindled.

Respondent argues that no theft occurred and points to the fact that Paterson's conviction was for selling securities without being a registered dealer, a statutory felony which encompasses neither the idea of theft nor of fraudulent intent. This argument is wide of the mark. Although a conviction for theft in a State court may establish conclusively the existence of a theft for purposes of section 165(e), *J. H. McKinley*, 34 T.C. 59, a taxpayer may choose not to move against the thief in a State proceedings and still not be excluded from the benefit of section 165(e). *Kennedy* v. *United States*, 109 F. Supp. 509. Therefore the fact that Paterson was convicted of a crime other than theft does not exclude from consideration the existence of a theft. With or without a conviction, the factual existence of a theft is what brings section 165(e) into operation. Whether or not a theft occurred must be determined under State law. *Michele Monteleone*, 34 T.C. 688, and cases there cited.

In *Krietenstein* v. *Robinson*, 126 Ind. App. 63, 129 N.E. 2d 368, the court said:

---

[1] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

    \*      \*      \*      \*      \*      \*      \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

    \*      \*      \*      \*      \*      \*      \*

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. \* \* \*

    \*      \*      \*      \*      \*      \*      \*

(e) THEFT LOSSES.—For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

[2] All section references herein are to the Internal Revenue Code of 1954, as amended.

While we have no statutory crime in Indiana known as "theft" the word is generic and includes such crimes as embezzlement, larceny, robbery, horse stealing, etc., all of which involve a felonious intent. [129 N.E. 2d at 370.]

This language is at least as broad as that of *Edwards* v. *Bromberg*, 232 F. 2d 107, in which the Fifth Circuit said:

the word "theft" [in section 23(e) of the 1939 Code] * * * is * * * a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile. * * * [232 F. 2d at 110.]

We need not determine the exact nature of the crime under Indiana law. *Curtis H. Muncie*, 18 T.C. 849. The record convinces us that Paterson and Zak parted petitioner from his money by deceit and trick amounting to a criminal appropriation with felonious intent and that by so doing a theft occurred both within the meaning of Indiana law [3] and of section 165(e).

Respondent's only other argument that no theft occurred is that petitioner's checks were deposited in the corporate bank account and that withdrawals from that account were for "corporate business purposes." The short answer to this contention is that the record does not support it.

Respondent next argues that even if there were a theft it was from Pan Protective, not from petitioner, and he cannot claim a deduction for its theft losses. While the parties disagree as to whether Pan Protective ever came into existence as a corporate entity, whether it did or not is unimportant in this case. All it had received from the State was a permit to complete its organization. It could not yet undertake the purposes for which it was organized. Respondent's regulations under section 165 provide, in part: "Substance and not mere form shall govern in determining a deductible loss." Sec. 1.165–1(b), Income Tax Regs. The shell of the corporation cannot cast a shadow so deep that the true purposes of Paterson and Zak are hidden from the light of judicial scrutiny. The corporate entity was the device Paterson and Zak used to route the subscribers' money into their pockets. That Indiana recognizes no sanctuary can exist behind corporate doors in cases of this sort is evidenced by the judgment rendered in petitioner's favor in his suit against Paterson and Zak. We would do no less. We hold that petitioner suffered a theft loss within the meaning of section 165.

The next question is whether the loss is deductible in 1956. Section 165(a) provides that a loss deduction shall be allowed if "sustained during the taxable year and not compensated for by insurance or

---

[3] See, e.g., Ind. Ann. Stat. (1956), secs. 10–1704 (embezzlement), 10–2103 (false pretense, frauds), and 10–3001 (larceny).

otherwise" and section 165(e) explains that a theft loss "shall be treated as sustained during the taxable year in which the taxpayer discovers such loss."

Respondent's position is that during the year 1956, when the theft occurred, there were attempts to rehabilitate and reorganize the insurance company and petitioner had a claim pending in the receivership and a suit pending against the incorporators. Respondent relies upon his regulation, section 1.165–1(d)(3) and section 1.165–8(a)(2) which provide in effect that where there is reasonable prospect the petitioner might recover, the loss deduction should be taken in the year when it can be ascertained with reasonable certainty he will not.

The cited regulations apply "with respect to a casualty or other event which may result in a loss and which occurs after January 16, 1960" and one occurring prior thereto may be treated as a loss "in accordance with the rules then applicable." Sec. 1.165–1(d)(4).

In 1956 when the theft occurred the deduction for the loss could be taken in the year it occurred or in the year discovered. *Alison* v. *United States*, 344 U.S. 167. Here it occurred and was discovered in 1956. We hold it was properly deductible in that year. Other issues not considered have been resolved by concessions.

*Decision will be entered under Rule 50.*