NOLAND H. SCHNEIDER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schneider v. Commissioner
Docket No. 10998-76.
United States Tax Court
T.C. Memo 1979-335; 1979 Tax Ct. Memo LEXIS 193; 38 T.C.M. (CCH) 1290; T.C.M. (RIA) 79335; August 23, 1979, Filed John M. Bradley and David S. Geldzahler, for the petitioner. Thomas N. Thompson and Charles H. Cowley, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY Judge: Respondent determined a deficiency of $31,500 in petitioner's 1972 *194 Federal income tax. The sole issue presented is whether petitioner sustained a $50,000 theft loss within the meaning of section 165(c)(3) [1] during 1972. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of filing his petition herein, petitioner resided in Salt Lake City, Utah. During May of 1972, Noland H. Schneider (petitioner) was approached by George I. Norman, Jr. (Norman) about investing in the purchase of some patents on equipment used in the recording industry. Norman informed petitioner that $100,000 would be needed to purchase the patents and that if petitioner would invest $50,000 he would provide the other $50,000 himself. Since petitioner had made several profitable investments in the past in companies controlled by Norman, petitioner told Norman that he would be willing to invest $50,000 in the purchase of the patents if Norman believed the investment was worthwhile. Norman subsequently notified petitioner that negotiations for the acquisition of the patents were *195 underway and that the $50,000 would be needed from petitioner soon. Thereafter on May 12, 1972, Norman came to see petitioner and advised him that the $50,000 was needed because Norman was ready to fly to San Francisco and purchase the patents. Norman requested that petitioner furnish the $50,000 in the form of a personal check made out to petitioner and endorsed by petitioner so that the check would be a negotiable instrument. Norman indicated to petitioner that it was necessary for the check to be a negotiable instrument because he did not know whether petitioner's check would be given to a corporation or to the individuals that owned the patents. Petitioner prepared a personal check for $50,000 in the manner requested by Norman and delivered it to him.
Petitioner had previously engaged in a similar transaction with Norman wherein petitioner had given Norman $25,000 in the form of a blank check to acquire patents relating to a home water filter. As a result of this earlier transaction, petitioner and Norman acquired the patent rights to a home water filter and operated a private company which produced the filters for seven or eight months. When they sold the company, petitioner *196 made a small profit on his $25,000 investment in the water filter patents. After giving Norman the $50,000 check on May 12, 1972, petitioner did not see him until a week or so later. At that time petitioner asked Norman whether he had acquired the patents. Norman informed petitioner that the negotiations were progressing but that it was going to take a while longer to complete the transaction.Over the course of the next two months, whenever petitioner would see Norman petitioner would ask him whether the patents had been acquired and Norman would reply that the negotiations were progressing but that the patents had not yet been purchased. At the time petitioner gave Norman the $50,000 petitioner was aware that Norman was in the process of appealing a conviction for aiding and abetting the misapplication of funds from a Federally insured bank. Petitioner believed from his discussions with attorneys who represented Norman in the case that the conviction would be reversed on appeal and that Norman would not be sent to prison. However, when Norman's conviction was upheld by the Tenth Circuit Court of Appeals in July of 1972, petitioner became extremely concerned about the safety *197 of his $50,000 investment, especially because Norman had continually given him indefinite answers about the progress of the patent acquisition. Petitioner at this point inquired into the actual disposition of the $50,000 check he had given to Norman. He discovered that shortly after he gave the check to Norman, Norman gave the check to Frank Nelson (Nelson) who at that time was president of the Murray State Bank in Murray, Utah. Nelson in turn had the check cashed and delivered the $50,000 cash proceeds to Norman. When petitioner learned that the check had been converted into cash by Norman instead of being given to the owners of the patents, petitioner became convinced he had been defrauded by Norman. Petitioner than undertook efforts to recover his $50,000 investment from Norman. Between August and December of 1972 petitioner spoke with numerous people familiar with Norman in an effort to determine whether Norman had any assets that petitioner might reach in order to recoup his $50,000 investment. Petitioner first spoke with Donald Mayer (Mayer) who had been closely associated with Norman in various business operations during the past three years. Mayer told petitioner *198 that Norman always transacted his business through nominees and, consequently, Norman held no assets in his own name. Mayer was of the opinion that Norman's practice of holding assets only through nominees made recovery of petitioner's $50,000 in 1972 impossible. With the information petitioner obtained from Mayer, petitioner sought the advice of an attorney, Jay Gamble (Gamble) concerning the feasibility of obtaining a prejudgment attachment of assets belonging to Norman but held in the names of nominees. Gamble advised petitioner that it would be very difficult to obtain a prejudgment attachment order unless it was absolutely clear that the property was actually owned by Norman and even so petitioner would be required to post a considerable bond to obtain such an order. After discussing the situation with Gamble, petitioner contacted Shirley Jones (Jones), a long-time friend of petitioner, and also an attorney engaged by Norman. When petitioner requested Jones' assistance in getting his money back from Norman, Jones told petitioner that recovering the funds through a civil suit would be very difficult because Norman had gone to great lengths to make himself judgment proof *199 by not holding any assets in his own name. Petitioner continued his efforts to recover his investment by contacting other close business associates of Norman as well as two other attorneys in an attempt to interest them in collecting the money from Norman. In each instance, petitioner was informed that Norman held no assets in his own name that would be subject to attachment to satisfy petitioner's claim, and that any collection efforts directed against Norman would be fruitless. Finally, petitioner contacted the Salt Lake County Attorney, Carl Nemelka (Nemelka). Nemelka was personally acquainted with Norman and the manner in which Norman conducted his business affairs. Petitioner informed Nemelka that Norman had defrauded him of $50,000 and he was considering filing a criminal complaint against Norman. Although Nemelka said he would act on a criminal complaint, he told petitioner that since Norman's conviction had been affirmed, Norman would be going to prison soon and that petitioner should forget about collecting his $50,000 because Norman was judgment proof. While investigating the possibility of recovering his money, petitioner also learned that on April 15, 1972, Norman *200 gave the Internal Revenue Service a check for $405,125 in payment of his 1971 income taxes that was subsequently dishonored by the bank on which it was drawn. As of the end of 1972, the Internal Revenue Service had not collected on this check. In December of 1972, Norman telephoned petitioner and requested that they meet.Petitioner agreed to meet with Norman. During their meeting, petitioner informed Norman that a civil suit and a criminal action would be filed against him by petitioner. At this point in the discussion, Norman became very angry and said that he had nothing to lose, that he was not going to spend one day in jail, and that petitioner should forget about his $50,000. Thereafter, in March of 1973, Norman became a fugitive from justice. On petitioner's 1972 Federal income tax return the $50,000 he had given to Norman was deducted as a business bad debt. [2] Respondent in his statutory notice disallowed this deduction in its entirety. *201 OPINION The sole issue for our decision is whether petitioner sustained a $50,000 theft loss within the meaning of section 165(c)(3) during 1972 as a result of his payment of such amount to George I. Norman, Jr. Section 165(c)(3) allows a deduction for the loss of property sustained by a taxpayer as a result of theft. Section 165(e) provides that the deduction for such loss shall be treated as sustained in the taxable year in which the taxpayer discovers the loss. To show that a theft of property occurred within the meaning of section 165(c)(3) a taxpayer must establish that the loss of property constituted a theft under the laws of the jurisdiction where the loss occurred. Paine v. Commissioner,63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975); Monteleone v. Commissioner,34 T.C. 688, 692 (1960). There is no requirement, however, that the person claimed to have perpetrated the theft be convicted of theft for a theft loss deduction to be allowable. Vietzke v. Commissioner,37 T.C. 504, 510 (1961). Moreover, the term "theft" in section 165(c)(3) has a broad connoitation *202 that covers any criminal appropriation of another's property to the use of the taker including theft by swindling, false pretenses, and any other form of guile. Edwards v. Bromberg,232 F.2d 107, 110 (5th Cir. 1956). Thus, a loss is deductible under section 165(c)(3) even though the exact nature of the crime under applicable state law is not determined as long as the crime amounts to theft. Edwards v. Brmergsupra at 111; Vietzke v. Commissioner,supra at 511. If, however, in the year a theft loss is sustained there exists a reasonable prospect of recovery, then no portion of the loss with respect to which reimbursement may be received is deductible until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Sec. 1.165-1(d)(2)(i), Income Tax Regs. A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor. Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975). *203 Whether a reasonable prospect of recovery exists is a question of fact to be determined upon an examination of all the facts and circumstances. Sec. 1.165-1(e)(2)(i), Income Tax Regs. The standard for making this determination is an objective one, under which the Court must decide what was a "reasonable expectation" as of the close of the taxable year for which the deduction is claimed. Ramsay Scarlett & Co. v. Commissioner,supra at 811. Moreover, the situation is not to be viewed through the eyes of an "incorrigible optimist" and, hence, claims for recovery whose potential for success are remote or nebulous will not demand a postponement of the deduction. Ramsay Scarlett & Co. v. Commissioner,supra.
In the present case, petitioner contends that during 1972 he discovered that Norman had obtained $50,000 from him in a manner constituting a theft under Utah law and that there was no reasonable prospect of recovering this money at the close of 1972 because Norman was in effect judgment proof. Petitioner therefore concludes that he is entitled to a $50,000 theft loss deduction n 1972. Respondent, on the other hand, argues that petitioner *204 is entitled to no theft loss deduction in 1972 because petitioner has failed to prove (1) that Norman's acts constituted a theft under Utah law, and (2) that there was no reasonable prospect of recovery t the end of 1972. At the close of trial, we ruled from the bench that based on all the evidence presented we were convinced that petitioner had sustained a $50,000 theft loss in 1972. We believe petitioner clearly demonstrated that (1) the $50,000 loss discovered in 1972 was the result of a theft under Utah law and (2) no reasonable prospect of recovery existed at the close of 1972. In our view, the representations made to petitioner by Norman were false and the prmises he made to petitioner were never kept. In addition, petitioner gave Norman the $50,000 solely in reliance on these representations and promises.Moreover, Norman's conversion of petitioner's check into cash shortly after receiving it when he had told petitioner the check would be given to the sellers of the patents indicates that Norman never intended to make the investment in the patents on behalf of the petitioner. On the contrary, we believe Norman intended to defraud petitioner of $50,000 through this *205 scheme that clearly constitutes a crime of theft under Utah law. [3]
Furthermore, based on petitioner's extensive investigation of the availability of Norman's assets for attachment purposes it is obvious that any civil action brought for the recovery of the $50,000 at the close of 1972 would have been futile. [4] Norman's practice of transacting business through nominees and holding no assets in his own name made him in effect judgment proof. The possibility of recovery was thus *206 very remote. A postponement of the deduction in this case would therefore be unwarranted since there was clearly no reasonable prospect of recovery at the close of 1972. Accordingly, under section 165(c)(3) petitioner is entitled to a $49,900 theft loss deduction in 1972. [5]
To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended, and in force during the year in issue.↩
2. Although petitioner treated the loss as a sec. 166 business bad debt on his return, in his petition and at trial petitioner contended that he was entitled to a sec. 165 theft loss. Except for the $100 floor on deductions under sec. 165(c)(3), an ordinary loss deduction is the result under both sections.↩
3. Under Utah law, the elements of the crime of obtaining money under false pretenses are as follows: (a) A false or fraudulent representation; (b) Made knowing it to be such; (c) With intent to cheat or defraud the person to whom the representation was made; (d) An actual fraud must have to be perpetrated in the sense that something of value was obtained and the victim lost something of value; and (e) The representation must have induced the owner to part with his property in the sense that the owner parted with his property in reliance upon the truth of the representation. See Sec. 76-20-8, Utah Code Ann. (1953); State v. Vatsis,10 Utah 2d 244, 351 P.2d 96, 97↩ (1960).
4. We also note that during petitioner's investigation, he discovered that Norman had given the Internal Revenue Service a check for $405,125 in payment of his 1971 income taxes which was subsequently dishonored by the bank on which it was drawn and that as of the end of 1972 the check had not been collected by the Service.↩
5. The $50,000 loss petitioner sustained must be reduced by the $100 floor on deductions under sec. 165(c)(3), leaving petitioner with a $49,900 deduction.↩