DREW JENSEN and MARY JENSEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jensen v. Commissioner
Docket No. 8040-77.
United States Tax Court
T.C. Memo 1979-379; 1979 Tax Ct. Memo LEXIS 147; 39 T.C.M. (CCH) 163; T.C.M. (RIA) 79379; September 17, 1979, Filed William H. Adams, for the petitioners. Richard W. Kennedy, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1970
$4,762.68
1971
5,662.82
1973
8,947.96
Concessions having been made, the only issue remaining for decision is whether Drew Jensen (hereinafter petitioner) sustained a theft loss within the meaning of section 165(c)(3) [1] during 1973. *149 All of the facts have been stipulated and are so found. At the time of filing their petition herein, petitioners, Drew Jensen and his wife Mary Jensen, resided in Salt Lake City, Utah.
Petitioner earned most of his income from investment activities. In early 1972 petitioner became interested in investing in small, privately owned businesses. Thereafter, petitioner met Steve Baughman (Baughman) while patronizing a motorcycle sales business operated by Baughman. Baughman told petitioner he was having difficulty raising sufficient capital to keep the business in operation and indicated that he was looking for new sources of capital to finance his business. After petitioner became convinced that Baughman, with proper financial backing, could manage a successful motorcycle sales business, petitioner agreed to go into business with Baughman. To operate the business and to provide him with limited personal liability, petitioner formed a corporation, Performance Cycle, Inc. (Cycle). A corporate charter was issued to Cycle by the State of Utah on March 16, 1972. All of the stock in Cycle was issued to petitioner, who became president of Cycle. Baughman was hired by Cycle as *150 general manager. As part of its corporate activities, Cycle bought and sold merchandise, advertised under the name "Performance Cycle, Inc." and filed U.S. corporate income tax returns for the taxable years ending March 31, 1973, and March 31, 1974. In his capacity as general manager Baughman was to provide the management expertise necessary to a successful motocycle sales business. Thus, Baughman made many of the decisions concerning the day-to-day operation of Cycle. Petitioner, as owner of Cycle, provided the financing necessary for the business to operate. However, petitioner also made decisions relating to the company's operation. In addition, petitioner was the only individual authorized to sign checks drawn on Cycle's checking account. When Cycle first began to operate, petitioner personally established a flooring account which enabled the corporation to buy inventory on credit. Petitioner subsequently closed this personal flooring account and transferred funds directly to the corporation to be used for the purchase of inventory. He planned to have the corporation reimburse him for the funds advanced from proceeds received on the sale of inventory. While it was *151 anticipated that the corporation would use the funds advanced by petitioner to purchase inventory, as part of the franchising arrangement with major suppliers petitioner also signed standard flooring arrangements as guarantor for Cycle. During 1972 and 1973, petitioner transferred substantial sums to the corporation in the form of capital and loans. However, the parties have stipulated thawt it is impossible to determine exactly which amounts were capital and which were loans. Listed below are all the amounts petitioner transferred to the corporation, the date upon which such amounts were transferred, and the amounts which were ultimately repaid to him: Date
Amounts Transferred
Payments
Balance
2/4/72 $ 2,049.00
$ 2,049.00
3/1/72
$ 7,000.00 (Flooring
-4,951.00
Payment)
3/14/72
2,200.00
-2,751.00
3/14/72
6,000.00
3,24 9.00
3/16/72
1,500.00
4,749.00
3/18/72
4,000.00
8,749.00
3/18/72
6,500.00
15,249.00
3/23/72
7,500.00
22,749. 00
4/13/72
3,000.00
25,749.00
4/25/72
3,941.64
29,690.64
5/31/72
1,000.00
30,690.64
6/12/72
7,000.00
37,690. 64
7/31/72
4,000.00
41,690.64
8/23/72
10,000.00
51,690.64
8/10/72
6,000.00
57,690.64
9/20/72
5,000.00
62,690 .64
10/13/72
8,000.00
70,690.64
10/19/72
9,000.00
79,690.64
11/2/72
3,000.00
82,690.64
1/5/73
24,000.00
106,690.64
2/13/73
9,000.00
115,690.64
3/12/73
115,690.64
4/16/73
115,690.64
5/29/73
3,000.00 (Payment)
112,690.64
6/7/73
112,690.64
6/20/73
112,690.64
6/26/73
112,690.64
7/8/73
3,000.00 (Payment)
109,690.64
8/8/73
3,000.00 (Payment)
106,690.64
8/11/73
106,690.64
8/11/73
106,690.64
8/11/73
3,000.00 (Payment)
103,690.64
11/6/73
24,000.00
127,690.64
12/6/73
21,617.53
149,308.17
12/31/73
2,312.29 (Payment)
146,995.88
TOTAL
$168,308.17
$21,312.29 [2]
$146,995.88
*152 Shortly after the corporate business commenced, Baughman used proceeds from the sale of corporate merchandise to pay off his personal debts. Thereafter Baughman continued to appropriate for his personal use the proceeds of a significant portion of the sales. He also extracted funds through the use of forged checks and checks made payable to fictitious payees. These misappropriations continued throughout the period of time that Baughman managed Cycle. Also during this period, Baughman represented to petitioner that additional inventory was being purchased with the funds petitioner advanced to the corporation. However, Baughman was actually financing the purchase of inventory through the flooring arrangements set up by petitioner with Cycle's major suppliers. This use of the flooring arrangements was contrary to petitioner's instructions and without his knowledge. After September 1972, Baughman was responsible for keeping the corporate books. In preparing the books, he recorded substantial accounts receivable which did not exist and failed to reflect substantial accounts *153 payable, particularly amounts owed to the two major suppliers, which amounts were incurred by Baughman's unauthorized use of the flooring accounts. In addition, Baughman regularly supplied petitioner with financial statements which overstated the accounts receivable and understated the liabilities of Cycle. In September 1973, petitioner discovered that Baughman had been embezzling from Cycle. Although at the time petitioner was unaware of the true nature and extent of the embezzlement, he took prompt action and bodily evicted Baughman from Cycle's premises on September 17, 1973. To minimize his losses, petitioner considered two alternatives: declaring Cycle bankrupt or continuing the business under new management. In an effort to avoid the adverse impact the bankruptcy of Cycle might have on his personal business reputation, petitioner decided to continue the business. Consequently, in late 1973 petitioner hired a new manager for Cycle. At this same time, petitioner paid off the amounts owed to two major suppliers on the flooring accounts which he had personally guaranteed. In November 1973 he paid one of these suppliers $24,000 from his personal funds and in December 1973 *154 he transferred to Cycle $21,617.53 to pay the other supplier. Petitioner discovered in early 1974 that most of the receivables being carried on Cycle's books were nonexistent, that the corporation had substantial debts which were not reflected on its books, and that a great deal of additional capital would be required to keep the business in operation. Because of these factors and the difficulty of finding a competent manager, petitioner decided to liquidate Cycle. The assets of Cycle were sold on June 1, 1974, and at that time the corporation ceased doing business. The proceeds from the sale were used solely to pay creditors of the corporation. In connection with a civil suit filed against Baughman in 1974, petitioner discovered that the only asserts Baughman held in his name had little or no value. Petitioner also learned that Baughman had declared bankruptcy in 1971. One year after filing suit, petitioner concluded that proceeding with the action would not result in recovery of any of the embezzled funds and, therefore, the suit was not further prosecuted. No criminal action was ever commenced against Baughman as a result of his embezzlement activity. However, petitioner *155 did turn over all the information he had regarding the embezzlement to the Salt Lake County Attorney's Office late in 1973 but that office made a decision not to prosecute. On his 1973 income tax return, petitioner deducted $78,617.53 as a business had debt for loans petitioner made to Cycle because petitioner claimed to be in the business of lending money. Petitioner also claimed that the $78,617.53 business bad debt deduction gave rise to a net operating loss in 1973 which he carried back as a deduction for 1970 and 1971. Respondent in his statutory notice disallowed the business bad debt deduction for 1973 and the net operating loss carryback deductions for 1970 and 1971 in their entirety. However, in the explanation of adjustments attached to the statutory notice, respondent did allow petitioner a $83,839.26 section 166(d) nonbusiness bad debt deduction in 1973 as a result of the loans petitioner made to Cycle. [3]
*156 In his petition and on brief, petitioner claims he is entitled to a section 165 theft loss in 1973, having conceded he is not entitled to a section 166 business bad debt deduction, because he was not in the business of lending money. [4]
The sole issue for decision is whether petitioner sustained a theft loss within the meaning of section 165(c)(3) during 1973 as a result of Baughman's misappropriation of Cycle's funds. Section 165(c)(3) allows a deduction for the loss of property sustained by a taxpayer as a result of theft. Section 165(e) provides that the deduction for such loss shall be treated as sustained in the taxable year in which the taxpayer discovers the loss. A theft loss deduction may be claimed only by the taxpayer who was the owner of the property when it was criminally appropriated. Mannette v. Commissioner,69 T.C. 990, 994 (1978); Rink v. Commissioner,51 T.C. 746, 753 (1969). Thus, where a corporation owns property which is stolen, a shareholder is not entitled to a deduction *157 for such theft loss. Rink v. Commissioner,supra.If however, the corporation is a sham such entity may be disregarded and the loss attributed directly to a shareholder. Vietzke v. Commissioner,37 T.C. 504, 511 (1961).
Ownership of property is a question of state law. United States v. Mitchell,403 U.S. 190, 197 (1971); Estate of Williams v. Commissioner,62 T.C. 400, 407 (1974). Under Utah law when a shareholder transfers funds to a corporation with the intention of making a capital contribution or loan, effect will be given to such intention and the corporation will become owner of the funds. Vulcan Steel Corporation v. Markosian,23 Utah 2d 287, 462 P.2d 166, 167 (1969). Barrus v. Wilkinson,16 Utah 2d 204, 398 P.2d 207, 208 (1965); Cornwall v. Willow Creek Country Club,13 Utah 2d 160, 369 P.2d 928, 929 (1962). See also Sec. 16-10-4(d) and Sec. 16-10-4(h), Utah Code Ann. (162); 6A Fletcher on Corporations Sec. 2783 (1968). In addition to owning the property at the time of loss, to qualify for a deduction under section 165(c)(3) a taxpayer must establish *158 that the loss of property constituted a theft under the laws of the jurisdiction where the loss occurred. Paine v. Commissioner,63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975); Monteleone v. Commissioner,34 T.C. 688, 692 (1960). Moreover, if in the year a theft loss is sustained there exists a reasonable prospect of recovery, then no portion of the loss with respect to which reimbursement may be received is deductible until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Sec. 1.165-1(d)(2)(i), Income Tax Regs.
On brief petitioner makes the following two arguments: (1) petitioner is entitled to a theft loss deduction of $146,995.88, [5] and (2) petitioner is entitled to claim the loss in the taxable year 1973. With respect to his first argument, petitioner contends that the theft by Baughman was actually a theft from petitioner in his individual capacity as an investor rather than a theft from Cycle of corporate property. Petitioner also maintains that Baughman induced petitioner to transfer funds to Cycle which Baughman intended to appropriate *159 to his own use and, thus, Cycle was nothing more than a tool used by Baughman to illegally obtain funds from petitioner. As for his second argument, petitioner contends that because he discovered the loss in 1973 and since there was no reasonable prospect of recovery at the end of 1973, he is entitled to claim the loss in the taxable year 1973.
Respondent, on the other hand, argues that petitioner is not entitled to a theft loss deduction because the funds allegedly stolen were the property of Cycle and, therefore, if any loss was *160 sustained, it was sustained by Cycle and not petitioner. In the alternative, respondent contends that if petitioner is entitled to claim the loss, then no deduction is allowable for 1973 because there existed a reasonable prospect of recovery as of the end of 1973. Based on the record as a whole, we conclude that Cycle owned the funds at the time they were misappropriated by Baughman, and, if any loss was sustained, it was sustained by Cycle and not by petitioner. Consequently, we hold that petitioner is not entitled to the theft loss he claimed on his 1973 return with respect to the misappropriation of these funds. [6] Our decision rests on several factors. *161 First, when petitioner transferred the funds to Cycle as capital contributions and loans we believe petitioner intended to transfer ownership of these funds to Cycle. Thus, under Utah law it is clear that these funds belonged to Cycle at the time they were misappropriated by Baughman. Moreover, a significant portion of the funds misappropriated by Baughman were proceeds from the sale of Cycle's merchandise and such proceeds certainly belonged to Cycle and not petitioner at the time they were misappropriated. Second, we do not believe that Cycle was a sham as petitioner implies. On the contrary, Cycle was a properly organized corporation, owned entirely by petitioner, which conducted business for over two years. As part of its corporate activities, Cycle bought and sold merchandise, advertised under the name "Performance Cycle, Inc." and filed U.S. corporation income tax returns for the taxable years ending March 31, 1973, and March 31, 1974. Finally, since petitioner formed Cycle to limit his personal liability and arranged for the corporation to be actively operated we do not believe the existence of Cycle should now be disregarded to permit petitioner to reduce his tax *162 liability. See Rink v. Commissioner,supra at 752. See also Moline Properties v. Commissioner,319 U.S. 436, 438 (1943). Accordingly, the deficiencies determined by respondent in petitioner's income taxes for 1970, 1971, and 1973 are hereby sustained. [7]
Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in force during the years in issue.↩
2. This total excludes $4,062.36 in interest payments that Cycle also made to petitioner during 1973.↩
3. Although a sec. 165(c)(3) theft loss may give rise to a net operating loss deduction, a sec. 166(d) nonbusiness bad debt cannot. See sec. 172(d)(4). Therefore, the $83,839.26 non-business bad debt deduction that respondent allowed petitioner for 1973 cannot give rise to a net operating loss in 1973.↩
4. Except for the $100 floor on deductions under sec. 165(c)(3), an ordinary loss deduction is the result under both sec. 165 and sec. 166.↩
5. This amount is a substantial increase from the amount claimed as a business bad debt deduction on petitioner's 1973 return. Petitioner calculated this $146,955.88 claimed loss by reducing $168,308.17 (the total amount of funds petitioner transferred to Cycle or used to reduce Cycle's debts) by $21,312.29 (the total amount Cycle repaid to petitioner). Included within this $146,955.88 is $45,617.53 that petitioner used to pay off Cycle's creditors after he discovered Baughman's misappropriations. Our disposition of this case makes it unnecessary to determine whether the $45,617.53 is deductible under sec. 165(c)(3) as a loss "arising from" theft.↩
6. On brief in a footnote, petitioner in a very vague manner appears to make the argument that if he is allowed a theft loss deduction in 1973, then he sustained a net operating loss in 1973. While section 172(d)(4)(C) provides that a theft loss may give rise to a net operating loss deduction, since we hold that petitioner in his individual capacity sustained no theft loss in 1973 no basis exists for the net operating loss that petitioner apparently claims for 1973. In another footnote on brief and in an equally vague manner, petitioner appears to argue that if he is not entitled to a theft loss deduction in 1973, then in addition to the nonbusiness bad debt deduction allowed by respondent, petitioner is entitled to a worthless stock loss on his Cycle stock in 1973. However, the stipulated facts make it clear that Cycle was in existence until June of 1974 when it was liquidated and its assets sold. In addition, as late as December 31, 1973, Cycle was still making loan repayments to petitioner. Consequently, we do not believe that petitioner's stock in Cycle was worthless as of the end of 1973. Moreover, even if petitioner's Cycle stock became worthless in 1973, the stipulated facts make it clear that it is not possible to determine which amounts petitioner transferred to Cycle were capital contributions and which were loans. Thus, there is no way we could measure the loss petitioner apparently claims to have sustained in 1973 on his Cycle stock. We note however that sec. 6511(d)(1) provides a seven year statute of limitations on sec. 165(g) worthless stock losses and, thus, if petitioner's Cycle stock became worthless in 1974 or thereafter, petitioner is entitled to make a claim for such loss.↩
7. Since we have held that if a theft loss was sustained it was sustained by Cycle, and not by petitioner, we do not reach petitioner's second argument that he was entitled to the theft loss deduction in 1973. For this same reason, we need not consider respondent's alternative argument that petitioner had a reasonable prospect of recovery as of the end of 1973.↩