HARRY H. ENNIS and VIRGINIA ENNIS, Petitioners v. COMISSIONER OF INTERNAL REVENUE, Respondent
Ennis v. Commissioner
Docket No. 6894-84.
United States Tax Court
T.C. Memo 1986-178; 1986 Tax Ct. Memo LEXIS 433; 51 T.C.M. (CCH) 958; T.C.M. (RIA) 86178; April 29, 1986. W. Kevin Jackson, for the petitioners. James B. Ausenbaugh, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice dated December 15, 1983, respondent determined a deficiency in petitioners' 1981 Federal income tax liability in the amount of $37,670. Following concessions, the issue remaining for decision is whether petitioners suffered a theft loss deductible under section 165(c)(3). [1]
*434 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The pertinent facts, insofar as they appear in the record herein, are set forth below. Petitioners, Harry H. and Virginia Ennis, are husband and wife and reside in Salt Lake City, Utah. Petitioners filed a timely joint Federal income tax return for 1981. Harry H. Ennis, hereinafter referred to as petitioner, is a physician and surgeon, and was employed by the Obstetrics and Gynecology Clinic, Inc., of Salt Lake City, Utah, during 1981. Virginia Ennis is a petitioner in this action solely because she joined with her husband in filing a joint Federal income tax return for 1981. The present controversy arises out of petitioner's financial support of a mutual life insurance company known as TMT Mutual Life Company ("TMT Mutual"). In 1976, petitioner was approached by the president and promoter of TMT Mutual, Thomas M. Tebbs ("Tebbs"). Tebbs was the sole proprietor of an insurance agency known as T.M. Tebbs Co. Tebbs told petitioner that he intended to form a mutual life insurance company (namely, TMT Mutual) and that he needed a substantial sum of money to satisfy certain statutory requirements *435 of the State of Utah before the Commissioner of Insurance of the State of Utah would issue a permit for TMT Mutual to operate as an insurance company. Tebbs indicated to petitioner that he already had obtained investments in the proposed venture from five or six other individuals and that he expected the new company to be profitable. Tebbs told petitioner and other potential investors that they would receive certificates of contribution from TMT Mutual to evidence their loans to or investments in the company. Although Tebbs apparently did not have a solicitation permit required by Utah State law, [2] he solicited petitioner for a loan to TMT Mutual of $100,000. Petitioner told Tebbs that he only had $8,000 available for the investment, and on March 4, 1977, petitioner transferred $8,000 to TMT Mutual as a loan. On April 12, 1977, Tebbs obtained a personal short-term *436 loan from Walker Bank and Trust Company ("Walker Bank") in the amount of $55,000 for use in connection with the business of TMT Mutual. The stated interest rate on the loan was 8.5 percent per year, with a due date of July 11, 1977. The loan proceeds apparently were to be reloaned by Tebbs to TMT Mutual. From the loan proceeds, $50,000 was placed in a depository or escrow account on behalf of TMT Mutual on April 15, 1977, under an agreement between TMT Mutual, the Utah State Insurance Commissioner, and Walker Bank. Such an escrow account was required by Utah law [3] before permission could be obtained from the Utah Commissioner of Insurance to establish an insurance company. TMT Mutual filed Articles of Incorporation with the State of Utah on April 15, 1977. On that same day, a Certificate of Authority was issued to TMT Mutual by the Utah Commissioner of Insurance allowing it to do business as an insurance company. On April 26, 1977, Tebbs personally borrowed and additional $20,000 from Walker Bank in connection with the start up of TMT Mutual. The stated interest rate on that loan was 8.5 percent per year and the due date was *437 October 25, 1977. The purpose of that loan, as stated on the bank's loan report, was for "interim working capital" for TMT Mutual. On September 1, 1977, Tebbs also refinanced in his own name the Walker Bank $55,000 loan he had obtained on April 12, 1977. On October 4, 1977, Tebbs personally obtained a $12,000 loan from Valley Bank and Trust Company ("Valley Bank"). The $12,000 proceeds from this loan were to be reloaned by Tebbs to TMT Mutual and were to be used by TMT Mutual as additional working capital. Petitioner added his personal endorsement to the $12,000 promissory note to Valley Bank. On or about December 30, 1977, petitioner and Tebbs jointly applied for and received an $80,000 loan from Walker Bank to refinance the two loans totaling $75,000 that Tebbs originally had received from Walker Bank in April of 1977. By December of 1977, Walker Bank apparently had bacome concerned about the credit worthiness of Tebbs and required petitioner's co-signature on the $80,000 promissory note of Tebbs. Although TMT was to issue certificates of contribution to investors who loaned money to TMT Mutual, no such certificates were issued. TMT never issued any insurance policies, *438 nor did it ever transact any business apart from the loan transactions mentioned above. On February 27, 1978, Tebbs, on behalf of TMT Mutual, wrote a letter to the Utah Insurance Commissioner requesting permission to withdraw from the escrow account of TMT Mutual at Walker Bank the $50,000 deposited therein. In that letter, Tebbs represented, among other things, that TMT Mutual had not issued any insurance policies, had no liabilities outstanding against it, and that the funds to be withdrawn were to be used for "other business purposes." On March 1, 1978, the Utah Insurance Commissioner responded to Tebbs' letter, indicating that the $50,000 would be released upon receipt of TMT Mutual's Certificate of Authority. On March 8, 1978, upon receipt of TMT Mutual's Certificate of Authority and after authorization by the Utah Insurance Commissioner, the $50,000 in the escrow account was paid by Walker Bank to TMT Mutual. Tebbs endorsed the $50,000 cashier's check TMT Mutual received from Walker Bank and deposited the entire $50,000 into his wife's personal bank account. An officer of Walker Bank contacted petitioner prior to release of the $50,000 from the TMT Mutual escrow account. *439 Petitioner agreed to the release of the $50,000, having been previously told by Tebbs that the $50,000 would be applied to reduce the $80,000 debt to Walker Bank. When petitioner learned that the $50,000 was deposited into Tebbs' wife's personal bank account and was not used to pay down the $80,000 debt, petitioner confronted Tebbs. Apparently to placate petitioner, Tebbs, on September 30, 1978, signed four promissory notes payable to petitioner, each in the amount of $20,000. On August 21, 1979, Tebbs, aka T.M. Tebbs Company and T. M. Agency (a sole proprietorship), filed a bankruptcy petition in the United States District Court for the Central District of Utah. TMT Mutual was not a party to the bankruptcy proceeding. Petitioner filed a proof of claim in the bankruptcy proceeding based on the four $20,000 promissory notes Tebbs gave him on September 30, 1978, but petitioner did not assert in the bankruptcy proceeding that the debts of Tebbs reflected by those four promissory notes were not dischargeable in bankruptcy due to the fraud or illegal acts of Tebbs, nor did petitioner allege therein that he had been robbed or defrauded by Tebbs. On June 12, 1981, an order was entered *440 in the bankruptcy proceeding discharging Tebbs from the liabilities set forth in the bankruptcy petition. Petitioner did not receive anything on his claim. TMT Mutual was involuntarily dissolved by the State of Utah on December 31, 1979, for failure to file annual reports. Petitioner was called upon to pay the $12,000 promissory note of Tebbs to Valley Bank because of his endorsement of the note. He made that payment on November 17, 1980. Petitioner also was called upon to pay $71,000 to Walker Bank, which was the balance due on the December 31, 1977, $80,000 promissory note to Walker Bank signed by Tebbs and petitioner. Petitioner paid that amount in 1981. Petitioner claims herein a theft loss in 1981 in the amount of $71,000, relating to his payment of that amount in 1981 on the promissory note to Walker Bank. OPINION Petitioner alleges that he was induced by fraudulent misrepresentations of Tebbs to endorse and cosign the December 31, 1977, promissory noter to Walker Bank totaling $80,000 and that in 1981 when he paid $71,000 to Walker Bank on that note, he incurred a theft loss deductible under section 165(c)(3). [4] Respondent alleges, among other things, that petitioner's *441 payment of the $71,000 did not arise out of a theft and that if anyone was robbed by Tebbs, it was TMT Mutual, not petitioner. For the reasons explained below we agree with respondent. For Federal income tax purposes, the issue of whether a theft loss occurred must be determined under the laws of the state or other jurisdiction wherein the loss allegedly was sustained. Paine v. Commissioner,63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975); Monteleone v. Commissioner,34 T.C. 688, 692 (1960). The exact nature of a theft, whether it be larceny, embezzlement, obtaining money by false pretenses, or other wrongful *442 deprivation of property of another, is of little importance provided it constitutes a theft. Edwards v. Bromberg,232 F.2d 107, 111 (5th Cir. 1956); Norton v. Commissioner,40 T.C. 500, 506 (1963), affd. 333 F.2d 1005 (9th Cir. 1964). Petitioners bear the burden of proof with respect to this issue. Rule 142(a). A criminal conviction is not necessary to prove that a theft occurred; however, the alleged loss must be shown to have been occasioned by circumstances clearly indicating theft. Monteleone v. Commissioner,supra at 694; Vietzke v. Commissioner,37 T.C. 504, 510 (1961); Jones v. Commissioner,24 T.C. 525, 528 (1955). Utah Code Ann. § 76-6-404 (1978) defines theft as follows: Theft--Elements.--A person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof. Petitioner contends that he was the victim of "theft by deception." Utah Code Ann. § 76-6-405 (1978) defines theft by deception as follows: Theft by deception.--(1) A person commits *443 theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof. (2) Theft by deception does not occur, however, when there is only falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed. "Puffing" means an exaggerated commendation of wares or worth in communications addressed to the public or to a class or group. Petitioner contends that prior to the time he signed the $80,000 promissory note on December 31, 1977, Tebbs told him that the funds to be obtained by Tebbs and TMT Mutual as a result of the loan were to be used to satisfy TMT Mutual's $50,000 escrow deposit requirement. Because the escrow account actually already had been funded in April of 1977 (with the funds Tebbs alone had borrowed from Walker Bank and apparently reloaned to TMT Mutual), petitioner alleges that he was deceived when Tebbs told him that his co-signature on the December promissory note was necessary for that purpose. Petitioner also alleges that Tebbs committed securities fraud and embezzlement of corporate funds under Utah law by soliciting investors for *444 an insurance company prior to obtaining the required certificate of solicitation and by misappropriating the $50,000 Tebbs, as president of TMT Mutual, received in March of 1978 when the escrow account at Walker Bank was closed and Tebbs deposited the $50,000 into his wife's personal account. More specifically, petitioner is most upset with Tebbs and describes him as a "common thief" who has traded in his "gun and mask * * * for a 3 piece suit, fancy cars, and a seductive smile * * *" and as a "wolf in sheep's clothing." We recognize and regard as most unfortunate the losses petitioner realized in connection with his investment in TMT Mutual at Tebbs' behest. We do not dispute that misrepresentations may have been made by Tebbs as an inducement for petitioner to make his initial $8,000 contribution to TMT Mutual. That $8,000, however, is not the loss that is at issue herein. The loss claimed by petitioner as a theft loss in 1981 arises from petitioner's payment in that year of $71,000 to Walker Bank as a result of his obligation as cosigner of the December 30, 1977, promissory note. We must decide whether petitioner's signature as comaker of that note was obtained by theft or *445 by deception. As explained, the deception that allegedly occurred in December of 1977 is that Tebbs told petitioner that the loan proceeds were needed to fund the escrow account of TMT Mutual before TMT Mutual could receive its certificate of authority from the Utah Insurance Commissioner when in fact of those events already had occurred in April of 1977. We cannot and do not accept petitioner's version of the alleged deception. We find it simply incredible that by the time petitioner cosigned the $80,000 promissory note to Walker Bank on December 30, 1977, petitioner would not have realized that TMT Mutual, at that time, already had its Certificate of Authority and already had funded the escrow account required by state law. By that time, petitioner had contributed $8,000 to TMT Mutual, and he had endorsed a $12,000 promissory note to Valley Bank in connection with the business of TMT Mutual. The $80,000 promissory note that petitioner cosigned, as he surely must have known, did not result in new funds being made available to him, to Tebbs or to TMT Mutual, but was simply a refinancing of prior loans made to Tebbs. No new funds, therefore, became available as a result of his *446 signature on that promissory note to fund anything, let alone the escrow account of TMT Mutual. We cannot accept the implication of petitioner's testimony that he made no effort in December of 1977 to verify with Walker Bank whether the escrow account had been established, whether and, if not, why not, TMT Mutual had received its Certificate of Authority and where the $80,000 loan proceeds went that previously had been obtained by Tebbs for use by TMT Mutual, the refinancing in which petitioner was now participating. The loan report of Walker Bank, dated January 24, 1978, concerning the December 31, 1977, $80,000 refinancing confirms that the refinancing was discussed personally between petitioner and the bank's loan officer, and petitioner expressly agreed with the loan officer that he (petitioner) would make "four equal annual payments to pay the loan out." This indicates that petitioner was something other than a passive individual who simply was cosigning the note as a personal accommodation for a friend with no anticipation of actually being required to make payments thereunder. We also note that when petitioner filed his claim in Tebbs' bankruptcy proceeding he did not therein *447 contend that Tebbs' obligation to him arose out of a theft or a fraud, but only out of a debtor-creditor relationship. On the record before us, we conclude that although petitioner may well have been misled by Tebbs with respect to some significant aspects of his investment in TMT Mutual, his cosigning of the December 30, 1977, promissory note (which was only a refinancing and which produced no new funds) constituted a debt undertaking on his part which he intentionally and knowingly agreed to and was not based upon, nor induced by a theft or deception against him. Petitioner also alleges that investors in Utah (including himself) generally tend to be unsophisticated, naive, and particularly susceptible to being defrauded. Such a contention is beyond the scope of this proceeding and is quite extraneous to the relevant evidence before us. Petitioner was well educated, articulate, intelligent and apparently very successful in his medical practice. We find that he knew what he was doing when he cosigned the $80,000 promissory note. His obligation thereunder that resulted in the payment of $71,000 in 1981 to Walker Bank did not arise from a theft. Decision will be entered under *448 Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the taxable year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Utah Code Ann. § 31-6-3↩ (1974), requires that any person forming or proposing to form an insurance company must first obtain a solicitation permit from the Utah Commissioner of Insurance prior to soliciting or receiving any funds and that any person in violation of this section shall be guilty of a felony.
3. See Utah Code Ann. § 31-5-2.5↩ (1974).
4. Sec. 165 provides in relevant part: (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * *↩